# RAWLINGS $v.$ KENTUCKY

No. 79–5146.   Argued March 26, 1980—Decided June 25, 1980

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and BLACKMUN, POWELL, and STEVENS, JJ., joined, and in Parts I and II–A of which STEWART and WHITE, JJ., joined. BLACKMUN, J., filed a concurring opinion, *post*, p. 111. WHITE, J., filed an opinion concurring in part, in which STEWART, J., joined, *post*, p. 113. MARSHALL, J., filed a dissenting opinion, in which BRENNAN, J., joined, *post*, p. 114.

*J. Vincent Aprile II* argued the cause and filed briefs for petitioner.

*Victor Fox*, Assistant Attorney General of Kentucky, argued the cause for respondent. With him on the brief were *Steven L. Beshear*, Attorney General, and *Gerald Henry* and *Patrick B. Kimberlin III*, Assistant Attorneys General.

Mr. Justice Rehnquist delivered the opinion of the Court.

Petitioner David Rawlings was convicted by the Commonwealth of Kentucky on charges of trafficking in, and possession of, various controlled substances. Throughout the proceedings below, Rawlings challenged the admissibility of certain evidence and statements on the ground that they were the fruits of an illegal detention and illegal searches. The trial court, the Kentucky Court of Appeals, and the Supreme Court of Kentucky all rejected Rawlings' challenges. We granted certiorari, 444 U. S. 989, and now affirm.

## I

In the middle of the afternoon on October 18, 1976, six police officers armed with a warrant for the arrest of one Lawrence Marquess on charges of drug distribution arrived at Marquess' house in Bowling Green, Ky. In the house at the time the police arrived were one of Marquess' housemates, Dennis Saddler, and four visitors, Keith Northern, Linda Braden, Vanessa Cox, and petitioner David Rawlings. While searching unsuccessfully in the house for Marquess, several police officers smelled marihuana smoke and saw marihuana seeds on the mantel in one of the bedrooms. After conferring briefly, Officers Eddie Railey and John Bruce left to obtain a search warrant. While Railey and Bruce were gone, the other four officers detained the occupants of the house in the living room, allowing them to leave only if they consented to a body search. Northern and Braden did consent to such a search and were permitted to depart. Saddler, Cox, and petitioner remained seated in the living room.

Approximately 45 minutes later, Railey and Bruce returned with a warrant authorizing them to search the house. Railey read the warrant to Saddler, Cox, and petitioner, and also read "*Miranda*" warnings from a card he carried in his pocket. At that time, Cox was seated on a couch with petitioner seated to her left. In the space between them was Cox's handbag. After Railey finished his recitation, he approached petitioner

and told him to stand. Officer Don Bivens simultaneously approached Cox and ordered her to empty the contents of her purse onto a coffee table in front of the couch. Among those contents were a jar containing 1,800 tablets of LSD and a number of smaller vials containing benzphetamine, methamphetamine, methyprylan, and pentobarbital, all of which are controlled substances under Kentucky law.

Upon pouring these objects out onto the coffee table, Cox turned to petitioner and told him "to take what was his." App. 62. Petitioner, who was standing in response to Officer Railey's command, immediately claimed ownership of the controlled substances. At that time, Railey searched petitioner's person and found $4,500 in cash in petitioner's shirt pocket and a knife in a sheath at petitioner's side. Railey then placed petitioner under formal arrest.

Petitioner was indicted for possession with intent to sell the various controlled substances recovered from Cox's purse. At the suppression hearing, he testified that he had flown into Bowling Green about a week before his arrest to look for a job and perhaps to attend the local university. He brought with him at that time the drugs later found in Cox's purse. Initially, petitioner stayed in the house where the arrest took place as the guest of Michael Swank, who shared the house with Marquess and Saddler. While at a party at that house, he met Cox and spent at least two nights of the next week on a couch at Cox's house.

On the morning of petitioner's arrest, Cox had dropped him off at Swank's house where he waited for her to return from class. At that time, he was carrying the drugs in a green bank bag. When Cox returned to the house to meet him, petitioner dumped the contents of the bank bag into Cox's purse. Although there is dispute over the discussion that took place, petitioner testified that he "asked her if she would carry this for me, and she said, 'yes'. . . ." App. 42.[1] Petitioner

---

[1] At petitioner's trial, Vanessa Cox described the transfer of possession quite differently. She testified that, as she and petitioner were getting

then left the room to use the bathroom and, by the time he returned, discovered that the police had arrived to arrest Marquess.

The trial court denied petitioner's motion to suppress the drugs and the money and to exclude the statements made by petitioner when the police discovered the drugs. According to the trial court, the warrant obtained by the police authorized them to search Cox's purse. Moreover, even if the search of the purse was illegal, the trial court believed that petitioner lacked "standing" to contest that search. Finally, the trial court believed that the search that revealed the money and the knife was permissible "under the exigencies of the situation." *Id.*, at 21. After a bench trial, petitioner was found guilty of possession with intent to sell LSD and of possession of benzphetamine, methamphetamine, methyprylan, and pentobarbital.

---

ready to leave the house, petitioner asked "would you please carry this for me" and simultaneously dumped the drugs into her purse. According to Cox, she looked into her purse, saw the drugs, and said "would you please take this, I do not want this in my purse." Petitioner allegedly replied "okay, just a minute, I will," and then went out of the room. At that point the police entered the house. Tr. 12–14. David Saddler, who was in the next room at the time of the transfer, corroborated Cox's version of the events, testifying that he heard Cox say "I do not want this in my purse" and that he heard petitioner reply "don't worry" or something to that effect. *Id.*, at 100.

Although none of the lower courts specifically found that Cox did not consent to the bailment, the trial court clearly was skeptical about petitioner's version of events:

"The Court finds it unbelievable that just of his own volition, David Rawlings put the contraband in the purse of Mrs. Cox just a minute before the officers knocked on the door. He had been carrying these things around Bowling Green in a bank deposit sack for days, either on his person or in his pocket, and it is unworthy of belief that just immediately before the officers knocked on the door that he put them in the purse of Vanessa Cox. It is far more plausible to believe that he saw the officers pull up out front and then elected to 'push them off' on Vanessa Cox, believing that search was probable, possible, and emminent [*sic*]." App. 21.

The Kentucky Court of Appeals affirmed. Disagreeing with the trial court, the appellate court held that petitioner did have "standing" to dispute the legality of the search of Cox's purse but that the detention of the five persons present in the house and the subsequent searches were legitimate because the police had probable cause to arrest all five people in the house when they smelled the marihuana smoke and saw the marihuana seeds.

The Supreme Court of Kentucky in turn affirmed, but again on a somewhat different rationale. See 581 S. W. 2d 348 (1979). According to the Supreme Court, petitioner had no "standing" because he had no "legitimate or reasonable expectation of freedom from governmental intrusion" into Cox's purse. *Id.*, at 350, citing *Rakas* v. *Illinois*, 439 U. S. 128 (1978). Moreover, according to the Supreme Court, the search uncovering the money in petitioner's pocket, which search followed petitioner's admission that he owned the drugs in Cox's purse, was justifiable as incident to a lawful arrest based on probable cause.

## II

In this Court, petitioner challenges three aspects of the judgment below. First, he claims that he did have a reasonable expectation of privacy in Cox's purse so as to allow him to challenge the legality of the search of that purse.[2] Second, petitioner argues that his admission of ownership was the fruit of an illegal detention that began when the police refused to let the occupants of the house leave unless they consented to a search. Third, petitioner contends that the search uncovering the money and the knife was itself illegal.

---

[2] Petitioner also claims that he is entitled to "automatic standing" to contest the legality of the search that uncovered the drugs. See *Jones* v. *United States*, 362 U. S. 257 (1960). Our decision today in *United States* v. *Salvucci, ante,* p. 83, disposes of this contention adversely to him.

## A

In holding that petitioner could not challenge the legality of the search of Cox's purse, the Supreme Court of Kentucky looked primarily to our then recent decision in *Rakas* v. *Illinois, supra,* where we abandoned a separate inquiry into a defendant's "standing" to contest an allegedly illegal search in favor of an inquiry that focused directly on the substance of the defendant's claim that he or she possessed a "legitimate expectation of privacy" in the area searched. See *Katz* v. *United States,* 389 U. S. 347 (1967). In the present case, the Supreme Court of Kentucky looked to the "totality of the circumstances," including petitioner's own admission at the suppression hearing that he did not believe that Cox's purse would be free from governmental intrusion,[3] and held that petitioner "[had] not made a sufficient showing that his legitimate or reasonable expectations of privacy were violated" by the search of the purse. 581 S. W. 2d, at 350.

We believe that the record in this case supports that conclusion. Petitioner, of course, bears the burden of proving not only that the search of Cox's purse was illegal, but also that he had a legitimate expectation of privacy in that purse. See

---

[3] Under questioning by his own counsel, petitioner testified as follows:

"Q72 Did you feel that Vannessa [*sic*] Cox's purse would be free from the intrusion of the officers as you sat there? When you put the pills in her purse, did you feel that they would be free from governmental intrusion?

"A No sir." App. 48.

The trial court also credited this statement, noting immediately:

"You know what, I believe this boy tells the truth. You all wanted to bring him in here before the Court, and he said, 'no, I want a jury.' He said 'no, I don't understand that.' And I don't blame him for not understanding that. That's the first time I've ever seen such a thing brought on before this Court, and I've been here for quite a few years as an attorney, of course.

"Now, no question but what the boy fully understood what was meant. by that. None at all in the Court's mind. If you want to go ahead, you can do so." *Ibid.*

*Rakas* v. *Illinois, supra,* at 131, n. 1; *Simmons* v. *United States,* 390 U. S. 377, 389–390 (1968). At the time petitioner dumped thousands of dollars worth of illegal drugs into Cox's purse, he had known her for only a few days. According to Cox's uncontested testimony, petitioner had never sought or received access to her purse prior to that sudden bailment. Contrast *Jones* v. *United States,* 362 U. S. 257, 259 (1960). Nor did petitioner have any right to exclude other persons from access to Cox's purse. See *Rakas* v. *Illinois, supra,* at 149. In fact, Cox testified that Bob Stallons, a longtime acquaintance and frequent companion of Cox's, had free access to her purse and on the very morning of the arrest had rummaged through its contents in search of a hairbrush. Moreover, even assuming that petitioner's version of the bailment is correct and that Cox did consent to the transfer of possession,[4] the precipitous nature of the transaction hardly supports a reasonable inference that petitioner took normal precautions to maintain his privacy. Contrast *United States* v. *Chadwick,* 433 U. S. 1, 11 (1977); *Katz* v. *United States, supra,* at 352. In addition to all the foregoing facts, the record also contains a frank admission by petitioner that he had no subjective expectation that Cox's purse would remain free from governmental intrusion, an admission credited by both the trial court and the Supreme Court of Kentucky. See n. 3, *supra,* and accompanying text.

Petitioner contends nevertheless that, because he claimed ownership of the drugs in Cox's purse, he should be entitled to challenge the search regardless of his expectation of privacy. We disagree. While petitioner's ownership of the drugs is undoubtedly one fact to be considered in this case, *Rakas* emphatically rejected the notion that "arcane" concepts of property law ought to control the ability to claim the protections of the Fourth Amendment. See 439 U. S., at 149–150, n. 17. See also *United States* v. *Salvucci, ante,* at 91–92.

_____
[4] But see n. 1, *supra.*

Had petitioner placed his drugs in plain view, he would still have owned them, but he could not claim any legitimate expectation of privacy. Prior to *Rakas,* petitioner might have been given "standing" in such a case to challenge a "search" that netted those drugs but probably would have lost his claim on the merits. After *Rakas,* the two inquiries merge into one: whether governmental officials violated any legitimate expectation of privacy held by petitioner.

In sum, we find no reason to overturn the lower court's conclusion that petitioner had no legitimate expectation of privacy in Cox's purse at the time of the search.

### B

We turn, then, to petitioner's contention that the occupants of the house were illegally detained by the police and that his admission to ownership of the drugs was a fruit of that illegal detention. Somewhat surprisingly, none of the courts below confronted this issue squarely, even though it would seem to be presented under any analysis of this case except that adopted by the Kentucky Court of Appeals, which concluded that the police officers were entitled to arrest the five occupants of the house as soon as they smelled marihuana smoke and saw the marihuana seeds.

We can assume both that this issue was properly presented in the Kentucky courts and that the police violated the Fourth and Fourteenth Amendments by detaining petitioner and his companions in the house while they obtained a search warrant for the premises. Even given such a constitutional violation, however, exclusion of petitioner's admissions would not be necessary unless his statements were the result of his illegal detention. As we noted in *Brown* v. *Illinois,* 422 U. S. 590, 603 (1975), where we rejected a "but for" approach to the admissibility of such statements, "persons arrested illegally frequently may decide to confess, as an act of free will unaffected by the initial illegality." In *Brown* we also set forth

the standard for determining whether such statements were tainted by antecedent illegality:

> "The question whether a confession is the product of a free will . . . must be answered on the facts of each case. No single fact is dispositive. . . . The *Miranda* warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest. But they are not the only factor to be considered. The temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct are all relevant. The voluntariness of the statement is a threshold requirement. And the burden of showing admissibility rests, of course, on the prosecution." *Id.*, at 603–604 (footnotes and citations omitted).

See also *Dunaway* v. *New York*, 442 U. S. 200, 218 (1979). As already noted, the lower courts did not undertake the inquiry suggested by *Brown*. Nevertheless, as in *Brown* itself, we believe that "the trial resulted in a record of amply sufficient detail and depth from which the determination may be made." 422 U. S., at 604.

First, we observe that petitioner received *Miranda* warnings only moments before he made his incriminating statements, a consideration *Brown* treated as important, although not dispositive, in determining whether the statements at issue were obtained by exploitation of an illegal detention.

Second, *Brown* calls our attention to the "temporal proximity of the arrest and the confession. . . ." *Id.*, at 603. In this case, petitioner and his companions were detained for a period of approximately 45 minutes. Although under the strictest of custodial conditions such a short lapse of time might not suffice to purge the initial taint, we believe it necessary to examine the precise conditions under which the occupants of this house were detained. By all accounts, the three people who chose not to consent to a body search in order to leave sat

quietly in the living room or, at least initially, moved freely about the first floor of the house. Upon being informed that he would be detained until Officers Railey and Bruce returned with a search warrant, Dennis Saddler "just went on in and got a cup of coffee and sat down and started waiting" for the officers to return. Tr. 109. When asked by petitioner's counsel whether there was "any show of force or violence by you or Dave or anybody else," Saddler explained:

> "A Oh, no. One person tried to sick my four and a half month old dog on one of the officers. (laughing)
>
> "Q48 You're saying that in a joking manner?
>
> "A Yeah. He just wagged his tail.
>
> "Q49 And other than that, that's the most violent thing you proposed toward these police officers; is that correct?
>
> "A Yes sir. I would—they were more or less courteous to us and were trying to be—we offered them coffee or a drink of water or whatever they wanted." *Id.,* at 113.

According to Saddler, petitioner's first reaction when the officers told him that he would be detained pending issuance of a search warrant was to "[get] up and put an album on. . . ." *Id.,* at 110. As even the dissenting judge in the Court of Appeals noted: "[A]ll witnesses for both sides of this litigation agreed to the congenial atmosphere existing during the forty-five minute interval. . . ." App. 73 (Lester, J., dissenting). We think that these circumstances outweigh the relatively short period of time that elapsed between the initiation of the detention and petitioner's admissions.

Third, *Brown* suggests that we inquire whether any circumstances intervened between the initial detention and the challenged statements. Here, where petitioner's admissions were apparently spontaneous reactions to the discovery of his drugs in Cox's purse, we have little doubt that this factor weighs heavily in favor of a finding that petitioner acted "of free will unaffected by the initial illegality." 422 U. S., at

603.   Nor need we speculate as to petitioner's motivations in admitting ownership of the drugs, since he explained them later to Lawrence Marquess and Dennis Saddler.   Under examination by petitioner's counsel, Marquess testified as follows:

> "Q1 Mr. Marquess, when you were talking to David Rawlings in the jail, and he told you that the things were dumped out on the table and that he admitted they were his, did he tell you why he did that?
>
> "A Well, he said Vanessa [Cox] was freaking out, you know, or something.
>
> "Q2 Did he tell you that he did that to protect her or words to that effect?
>
> "A Well, now, I mean he said he was going to take what was his, I mean, he wasn't going to try to pin that on her."   Tr. 130.

Saddler offered additional insight into petitioner's motivations:

> "Q114 Did Dave Rawlings make any statements to you in jail about any of these substances?
>
> "A Yes sir.
>
> "Q115 And would you tell the Court what statements he made?
>
> "A Well, his main concern was whether or not Vanessa Cox was going to say anything, and he just kept talking and harping on that, and I don't know how many times he mentioned it, you know, 'I hope she doesn't break,' or hope she doesn't talk.   And I saw her walking on the sidewalk through the windows and got a little upset about that because we all thought she turned State's evidence."   *Id.*, at 103.

Fourth, *Brown* mandates consideration of "the purpose and flagrancy of the official misconduct. . . ."   422 U. S., at 604. The officers who detained petitioner and his companions uniformly testified that they took those measures to avoid the

asportation or destruction of the marihuana they thought was present in the house and that they believed that a warrant authorizing them to search the house would also authorize them to search the five occupants of the house. While the legality of temporarily detaining a person at the scene of suspected drug activity to secure a search warrant may be an open question,[5] and while the officer's belief about the scope of the warrant they obtained may well have been erroneous under our recent decision in *Ybarra* v. *Illinois,* 444 U. S. 85 (1979), the conduct of the police here does not rise to the level of conscious or flagrant misconduct requiring prophylactic exclusion of petitioner's statements. Contrast *Brown* v. *Illinois, supra,* at 605.

Finally, while *Brown* requires that the voluntariness of the statement be established as a threshold requirement, petitioner has not argued here or in any other court that his admission to ownership of the drugs was anything other than voluntary. Thus, examining the totality of circumstances present in this case, we believe that the Commonwealth of Kentucky has carried its burden of showing that petitioner's statements were acts of free will unaffected by any illegality in the initial detention.

## C

Petitioner also contends that the search of his person that uncovered the money and the knife was illegal. Like the

---

[5] "The reasonableness of seizures that are less intrusive than a traditional arrest, see *Dunaway* v. *New York,* 442 U. S. 200, 209–210 (1979); *Terry* v. *Ohio,* 392 U. S. 1, 20 (1968), depends 'on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers.' *Pennsylvania* v. *Mimms,* 434 U. S. 106, 109 (1977); *United States* v. *Brignoni-Ponce,* [422 U. S. 873, 878 (1975)]. Consideration of the constitutionality of such seizures involves a weighing of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." *Brown* v. *Texas,* 443 U. S. 47, 50–51 (1979).

Supreme Court of Kentucky, we have no difficulty upholding this search as incident to petitioner's formal arrest. Once petitioner admitted ownership of the sizable quantity of drugs found in Cox's purse, the police clearly had probable cause to place petitioner under arrest. Where the formal arrest followed quickly on the heels of the challenged search of petitioner's person, we do not believe it particularly important that the search preceded the arrest rather than vice versa. See *Bailey* v. *United States,* 128 U. S. App. D. C. 354, 357, 389 F. 2d 305, 308 (1967); *United States* v. *Brown,* 150 U. S. App. D. C. 113, 114, 463 F. 2d 949, 950 (1972). See also *Cupp* v. *Murphy,* 412 U. S. 291 (1973); *United States* v. *Gorman,* 355 F. 2d 151, 160 (CA2 1965) (dictum), cert. denied, 384 U. S. 1024 (1966).[6]

## III

Having found no error in the lower courts' refusal to suppress the evidence challenged by petitioner, we believe that the judgment of the Supreme Court of Kentucky should be, and the same hereby is,

*Affirmed.*

MR. JUSTICE BLACKMUN, concurring.

I join the Court's opinion, but I write separately to explain my somewhat different approach to the issues addressed in Part II–A thereof.

In my view, *Rakas* v. *Illinois,* 439 U. S. 128 (1978), recognized two analytically distinct but "invariably intertwined" issues of substantive Fourth Amendment jurisprudence. *Id.,* at 139. The first is "whether [a] disputed search or seizure has infringed an interest of the defendant which the Fourth Amendment was designed to protect," *id.,* at 140; the second

---

[6] The fruits of the search of petitioner's person were, of course, not necessary to support probable cause to arrest petitioner.

is whether "the challenged search or seizure violated [that] Fourth Amendment righ[t]," *ibid*. The first of these questions is answered by determining whether the defendant has a "legitimate expectation of privacy" that has been invaded by a governmental search or seizure. The second is answered by determining whether applicable cause and warrant requirements have been properly observed.

I agree with the Court that these two inquiries "merge into one," *ante*, at 106, in the sense that both are to be addressed under the principles of Fourth Amendment analysis developed in *Katz* v. *United States*, 389 U. S. 347 (1967), and its progeny. But I do not read today's decision, or *Rakas*, as holding that it is improper for lower courts to treat these inquiries as distinct components of a Fourth Amendment claim. Indeed, I am convinced that it would invite confusion to hold otherwise. It remains possible for a defendant to prove that his legitimate interest of privacy was invaded, and yet fail to prove that the police acted illegally in doing so. And it is equally possible for a defendant to prove that the police acted illegally, and yet fail to prove that his own privacy interest was affected.

Nor do I read this Court's decisions to hold that property interests cannot be, in some circumstances at least, weighty factors in establishing the existence of Fourth Amendment rights. Not every concept of ownership or possession is "arcane." Not every interest in property exists only in the desiccated atmosphere of ancient maxims and dusty books. Earlier this Term the Court recognized that "the right to exclude" is an essential element of modern property rights. *Kaiser Aetna* v. *United States*, 444 U. S. 164, 179–180 (1979). In my view, that "right to exclude" often may be a principal determinant in the establishment of a legitimate Fourth Amendment interest. Accordingly, I would confine analysis to the facts of this case. On those facts, however, I agree that petitioner's possessory interest in the vials of controlled

substances is not sufficient to create a privacy interest in Vanessa Cox's purse, and that such an interest was not otherwise conferred by any agreement between petitioner and Cox.

MR. JUSTICE WHITE, with whom MR. JUSTICE STEWART joins, concurring in part.

Although I join Parts I and II-A of the Court's opinion, I do not join Parts II-B, II-C, and III because I believe that the fruits inquiry undertaken in Part II-B should not be done in the first instance in this Court. As the Court recognizes, the Supreme Court of Kentucky did not address the question whether petitioner's admission to ownership of the drugs was the fruit of an illegal detention, even though the question was presented there. The state-court majority did state that in concluding that the search of petitioner's person was incident to a valid arrest it "disregard[ed] as irrelevant the detention during the period in which the officers were procuring a search warrant." The court also observed that "[t]his search was not explored in detail at the suppression hearing" and that "the sequence of the search of the purse and Rawlings' admission of ownership of the drugs is not clearly established in the record." The court then concluded that "[c]learly, after Rawlings admitted ownership of the drugs, the officers were entitled to arrest and search the person, or search and then arrest." 581 S. W. 2d 348, 350 (1979).

In proceeding in this manner, the Supreme Court of Kentucky plainly failed properly to dispose of a federal question, as the Court implicitly recognizes. Because the fruits question was never addressed below and was barely mentioned in the briefs before this Court, I would vacate the judgment below and remand to permit the state court to address the question under the correct legal standard. This Court should not attempt to decide a factual issue on a record that the

state court itself apparently thought inadequate for that purpose.

MR. JUSTICE MARSHALL, with whom MR. JUSTICE BRENNAN joins, dissenting.

The vials of pills found in Vanessa Cox's purse and petitioner's admission that they belonged to him established his guilt conclusively. The State concedes, as it must, that the search of the purse was unreasonable and in violation of the Fourth Amendment, see *Ybarra* v. *Illinois,* 444 U. S. 85 (1979), and the Court assumes that the detention which led to the search, the seizure, and the admissions also violated the Fourth Amendment, *ante,* at 106. Nevertheless, the Court upholds the conviction. I dissent.

## I

The Court holds first that petitioner may not object to the introduction of the pills into evidence because the unconstitutional actions of the police officers did not violate his personal Fourth Amendment rights. To reach this result, the Court holds that the Constitution protects an individual against unreasonable searches and seizures only if he has "a 'legitimate expectation of privacy' in the area searched." *Ante,* at 104. This holding cavalierly rejects the fundamental principle, unquestioned until today, that an interest in either the place searched or the property seized is sufficient to invoke the Constitution's protections against unreasonable searches and seizures.

The Court's examination of previous Fourth Amendment cases begins and ends—as it must if it is to reach its desired conclusion—with *Rakas* v. *Illinois,* 439 U. S. 128 (1978). Contrary to the Court's assertion, however, *Rakas* did not establish that the Fourth Amendment protects individuals against unreasonable searches and seizures only if they have a privacy interest in the place searched. The question before the Court in *Rakas* was whether the defendants could estab-

lish their right to Fourth Amendment protection simply by showing that they were "legitimately on [the] premises" searched, see *Jones* v. *United States,* 362 U. S. 257, 267 (1960). Overruling that portion of *Jones,* the Court held that when a Fourth Amendment objection is based on an interest in the place searched, the defendant must show an actual invasion of his personal privacy interest. The petitioners in *Rakas* did not claim that they had standing either under the *Jones* automatic standing rule for persons charged with possessory offenses, which the Court overrules today, see *United States* v. *Salvucci, ante,* p. 83, or because their possessory interest in the items seized gave them "actual standing." No Fourth Amendment claim based on an interest in the property seized was before the Court, and, consequently, the Court did not and could not have decided whether such a claim could be maintained. In fact, the Court expressly disavowed any intention to foreclose such a claim ("This is not to say that such [casual] visitors could not contest the lawfulness of the seizure of evidence or the search if their own property were seized during the search," 439 U. S., at 142, n. 11), and suggested its continuing validity ("[P]etitioners' claims must fail. They asserted neither a property nor a possessory interest in the automobile, *nor an interest in the property seized," id.,* at 148 (emphasis supplied)).

The decision today, then, is not supported by the only case directly cited in its favor.* Further, the Court has ignored

---

*The Court invites the reader to "contrast" *Jones* v. *United States,* 362 U. S. 257 (1960), which it expressly overrules, and to "see" *Simmons* v. *United States,* 390 U. S. 377, 389–390 (1968). *Ante,* at 105, 104. The passage cited in *Simmons* contains the following language: "At one time, a defendant who wished to assert a Fourth Amendment objection was required to show that he was the owner or possessor *of the seized property* or that he had a possessory interest in the searched premises." 390 U. S., at 389–390 (emphasis supplied). The Court in *Simmons* then observed that *Jones* had "relaxed" those standing requirements by holding that in a case charging a possessory offense "the Government is precluded from denying that the defendant has the requisite possessory interest to chal-

a long tradition embodying the opposite view. *United States v. Jeffers,* 342 U. S. 48 (1951), for example, involved a seizure of contraband alleged to belong to the defendant from a hotel room occupied by his two aunts. The Court rejected the Government's argument that because the search of the room did not invade Jeffers' privacy he lacked standing to suppress the evidence. It held that standing to object to the seizure could not be separated from standing to object to the search, for "[t]he search and seizure are . . . incapable of being untied." *Id.,* at 52. The Court then concluded that Jeffers "unquestionably had standing . . . unless the contraband nature of the narcotics seized precluded his assertion, for purposes of the exclusionary rule, of *a property interest therein." Ibid.* (emphasis supplied).

Similarly, *Jones v. United States, supra,* is quite plainly premised on the understanding that an interest in the seized property is sufficient to establish that the defendant "himself was the victim of an invasion of privacy." 362 U. S., at 261. The Court observed that the "conventional standing requirement," *id.,* at 262, required the defendant to "claim either to have *owned or possessed the seized property* or to have had a substantial possessory interest in the premises searched," *id.,* at 261 (emphasis supplied). The Court relaxed that rule for defendants charged with possessory offenses because "[t]he same element . . . which has caused a dilemma, *i. e.,* that *possession both convicts and confers standing,* eliminates any necessity for a preliminary showing of an interest in the premises searched *or the property seized,* which ordinarily is

---

lenge the admission of the evidence. . . ." 390 U. S., at 390. The Court also "contrasts" two other cases in connection with its subsidiary point that a "bailment" that is "precipitous" may not be enough to show that a person "took normal precautions to maintain his privacy." *Ante,* at 105. The Court also cites *Katz v. United States,* 389 U. S. 347 (1967), as the source of the phrase "legitimate expectation of privacy." But *Katz* did not purport to restrict the interest protected by the Fourth Amendment, see *infra,* at 119–120.

required when standing is challenged." *Id.*, at 263 (emphasis supplied). Instead, "[t]he possession on the basis of which petitioner is to be and was convicted suffices to give him standing," *id.*, at 264.

*Simmons* v. *United States*, 390 U. S. 377 (1968), proceeded upon a like understanding. The Court there reiterated that prior to *Jones* "a defendant who wished to assert a Fourth Amendment objection was required to show that he was the owner or possessor *of the seized property* or that he had a possessory interest in the searched premises." 390 U. S., at 389–390 (emphasis supplied). *Jones* had changed that rule only with respect to defendants charged with possessory offenses, so the defendant Garrett, who was charged with armed robbery, had to establish standing. Because he was not "legitimately on [the] premises" at the time of the search, see *Jones, supra,* at 267, "[t]he only, or at least the most natural, way in which he could found standing to object to the admission of the suitcase was to testify that he was its owner." 390 U. S., at 391 (footnote omitted). See also *Brown* v. *United States*, 411 U. S. 223, 228 (1973); *Mancusi* v. *DeForte*, 392 U. S. 364, 367 (1968).

The Court's decision today is not wrong, however, simply because it is contrary to our previous cases. It is wrong because it is contrary to the Fourth Amendment, which guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." The Court's reading of the Amendment is far too narrow. The Court misreads the guarantee of security *"in* their persons, houses, papers, and effects, *against* unreasonable searches and seizures" to afford protection only against unreasonable searches and seizures *of* persons and places.

The Fourth Amendment, it seems to me, provides in plain language that if one's security in one's "effects" is disturbed by an unreasonable search and seizure, one has been the victim of a constitutional violation; and so it has always been

understood. Therefore the Court's insistence that in order to challenge the legality of the search one must also assert a protected interest in the premises is misplaced. The interest in the item seized is quite enough to establish that the defendant's personal Fourth Amendment rights have been invaded by the government's conduct.

The idea that a person cannot object to a search unless he can show an interest in the premises, even though he is the owner of the seized property, was squarely rejected almost 30 years ago in *United States* v. *Jeffers, supra.* There the Court stated:

> "The Government argues . . . that the search did not invade respondent's privacy and that he, therefore, lacked the necessary standing to suppress the evidence seized. The significant act, it says, is the seizure of the goods of the respondent without a warrant. We do not believe the events are so easily isolable. Rather they are bound together by one sole purpose—to locate and seize the narcotics of respondent. The search and seizure are, therefore, incapable of being untied. To hold that this search and seizure were lawful as to the respondent would permit a quibbling distinction to overturn a principle which was designed to protect a fundamental right." *Id.,* at 52.

When the government seizes a person's property, it interferes with his constitutionally protected right to be secure in his effects. That interference gives him the right to challenge the reasonableness of the government's conduct, including the seizure. If the defendant's property was seized as the result of an unreasonable search, the seizure cannot be other than unreasonable.

In holding that the Fourth Amendment protects only those with a privacy interest in the place searched, and not those with an ownership or possessory interest in the things seized, the Court has turned the development of the law of search

and seizure on its head. The history of the Fourth Amendment shows that it was designed to protect property interests as well as privacy interests; in fact, until *Jones* the question whether a person's Fourth Amendment rights had been violated turned on whether he had a property interest in the place searched or the items seized. *Jones* and *Katz* v. *United States,* 389 U. S. 347 (1967), expanded our view of the protections afforded by the Fourth Amendment by recognizing that privacy interests are protected even if they do not arise from property rights. But that recognition was never intended to exclude interests that had historically been sheltered by the Fourth Amendment from its protection. Neither *Jones* nor *Katz* purported to provide an exclusive definition of the interests protected by the Fourth Amendment. Indeed, as *Katz* recognized: "That Amendment protects individual privacy against certain kinds of governmental intrusion, but its protections go further, and often have nothing to do with privacy at all." 389 U. S., at 350. Those decisions freed Fourth Amendment jurisprudence from the constraints of "subtle distinctions, developed and refined by the common law in evolving the body of private property law which, more than almost any other branch of law, has been shaped by distinctions whose validity is largely historical." *Jones,* 362 U. S., at 266. Rejection of those finely drawn distinctions as irrelevant to the concerns of the Fourth Amendment did not render property rights wholly outside its protection, however. Not every concept involving property rights, we should remember, is "arcane." Cf. *ante,* at 105.

In fact, the Court rather inconsistently denies that property rights may, by themselves, entitle one to the protection of the Fourth Amendment; but simultaneously suggests that a person may claim such protection only if his expectation of privacy in the premises searched is so strong that he may exclude all others from that place. See *ante,* at 105–106; *Rakas* v. *Illinois,* 439 U. S., at 149. Such a harsh threshold require-

ment was not imposed even in the heyday of a property rights oriented Fourth Amendment.

## II

Petitioner also contends that his admission of ownership of the drugs should have been suppressed as the fruit of an unlawful detention. The state courts did not pass on that claim, and no factual record was developed which would shed light on the proper disposition of the claim. In such circumstances, it would be appropriate for us to defer to the state court and permit it to make the initial determination. Nevertheless, the majority proceeds to dispose of petitioner's claim by concluding that, even if the detention was illegal, "petitioner's statements were acts of free will unaffected by any illegality in the initial detention." *Ante,* at 110. I disagree.

Petitioner's admissions, far from being "spontaneous," *ante,* at 108, were made in response to Vanessa Cox's demand that petitioner "take what was his." In turn, it is plain that her statement was the direct product of the illegal search of her purse. And that search was made possible only because the police refused to let anyone in the house depart unless they "consented" to a body search; that detention the Court has assumed was illegal. Under these circumstances petitioner's admissions were obviously the fruit of the illegal detention and should have been suppressed.

## III

In the words of Mr. Justice Frankfurter: "A decision [of a Fourth Amendment claim] may turn on whether one gives that Amendment a place second to none in the Bill of Rights, or considers it on the whole a kind of nuisance, a serious impediment in the war against crime." *Harris* v. *United States,* 331 U. S. 145, 157 (1947) (dissenting opinion). Today a majority of the Court has substantially cut back the protection afforded by the Fourth Amendment and the ability of the

people to claim that protection, apparently out of concern lest the government's ability to obtain criminal convictions be impeded. A slow and steady erosion of the ability of victims of unconstitutional searches and seizures to obtain a remedy for the invasion of their rights saps the constitutional guarantee of its life just as surely as would a substantive limitation. Because we are called on to decide whether evidence should be excluded only when a search has been "successful," it is easy to forget that the standards we announce determine what government conduct is reasonable in searches and seizures directed at persons who turn out to be innocent as well as those who are guilty. I continue to believe that ungrudging application of the Fourth Amendment is indispensable to preserving the liberties of a democratic society. Accordingly, I dissent.