[No. B022223. Second Dist., Div. Three. Mar. 3, 1987.]

OCTAVIO LOZOYA, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

COUNSEL

Wilbur F. Littlefield, Public Defender, Laurence M. Sarnoff, Carole Telfer and Victor Salerno, Deputy Public Defenders, for Petitioner.

No appearance for Respondent.

Ira Reiner, District Attorney, Arnold T. Guminski and Maurice H. Oppenheim, Deputy District Attorneys, for Real Party in Interest.

OPINION

KLEIN, P. J.—Petitioner Octavio Lozoya (Lozoya) seeks a writ of prohibition to restrain any further proceedings against him on a criminal information charging him with murder on the grounds he was committed by the magistrate without probable cause.

Because the magistrate's finding of attenuation is not supported by the record, the petition is granted.

FACTUAL AND PROCEDURAL BACKGROUND[1]

On the evening of January 11, 1986, Michael Mosby (Mosby) was stabbed near the corner of 131st Street and Vermont Avenue in Los Angeles County, and died shortly thereafter.

On the morning of February 6, 1986, Lozoya was being interviewed at the police operations crash bureau at Avalon and 118th Street as a victim in an unrelated matter. At around 10 or 10:30 a.m., Lozoya was approached there by Detective Pietrantoni (Pietrantoni), who asked Lozoya if he were willing to discuss the murder of a Black man at 131st and Vermont. Lozoya agreed.

The detective's interest in Lozoya arose from the fact that Mosby had perpetrated a residential robbery on December 15, 1985, at the Mendez home. One of the victims, Sophia Mendez, was Lozoya's girlfriend. During an investigative interview of the robbery at the Mendez home by other officers on January 10, 1986, Lozoya entered the room and stated " 'The police

---

[1]The facts are developed from the preliminary hearing transcript.

never show up when you call them.' ... [¶] ... 'Don't worry about it. We'll take care of it."[2]

Pietrantoni told Lozoya he preferred they confer at the station, and Lozoya acquiesced. On the way to the Southeast station, Lozoya was advised of his rights. Pietrantoni testified they "really didn't have anything to arrest him for at the time." No positive identification had been made at that time and Lozoya had not been linked to a green Pinto used by the assailants. While Lozoya was not formally placed under arrest when transported to the station at about 10:30 a.m., he was not free to leave.

During the first of several interviews, which interview lasted about an hour, Lozoya denied he knew anything about the Mosby killing. Lozoya then agreed to submit to a polygraph examination, which was set for 1 p.m. at Parker Center in downtown Los Angeles. Lozoya told Youngblood, the polygraph examiner, that he had not slept for several days. Early in the examination Lozoya denied being present at the scene at the time of the stabbing.

Youngblood employed a number of tactics including telling Lozoya, among other things, that he didn't think any man would have let Mosby get away with what he did, referring to the robbery of Lozoya's girlfriend and her mother; that if Lozoya would cooperate, Lozoya would have some say on how things could go; that Lozoya had the choice of working with or against the authorities; and that he was uncertain as to whether Lozoya had done the actual stabbing. Youngblood told Lozoya he would try to clear him, and needed to know in which direction to go in the event the district attorney asked whether Lozoya was cooperating. Youngblood further asked: " 'You want me to tell the detectives to go ahead and file murder charges?' " Lozoya responded to Youngblood that he had told his girlfriend he would help her if the burglar returned, and admitted being near the scene, but denied stabbing Mosby.

Lozoya was taken back to the station at around 4:30 p.m. and formally arrested. He was again extensively interviewed, although Pietrantoni noted Lozoya was sleepy. Lozoya gave three different versions of what occurred, and implicated several other suspects. The detectives told him they were becoming upset with him and were running out of patience.

Following this interview, Lozoya accompanied the detectives to several locations in south Los Angeles to identify residences of gang members he had implicated.

---

[2]Although a hearsay objection at this point was sustained, the statement was not hearsay to the extent it was offered *not for its truth* but to show the officers' state of mind for investigatory purposes. (Evid. Code, § 1200.)

On Friday morning, February 7, Sophia Mendez and her sister were interviewed. Contrary to Lozoya's statements, they denied being present at the scene or being with Lozoya at the time of the stabbing. Lozoya was reinterviewed twice in the afternoon, with one technique being to admonish him repeatedly to tell the "fucking truth." Lozoya admitted participating in the initial fight, but claimed he had backed off and was not involved in the actual killing. In between the interviews, a suspect known as "Wild Man," implicated by Lozoya as the driver of the green Pinto involved in the attack on Mosby, was brought into the room to confront Lozoya. The suspect shouted and swore at Lozoya and frightened him and had to be removed.

The detectives did not work on Saturday and Sunday, February 8 and 9, and Lozoya remained in custody. He was again interviewed at 8:30 a.m. on Monday, February 10. Lozoya complained he had not been permitted to use the phone, and the officers told him he could do so as soon as they were through. This time Lozoya admitted being present at the scene, armed with a knife, and participating in the initial assault on Mosby. Consistent with his earlier statements, Lozoya continued to deny any involvement in the actual stabbing, and held to the position that he had backed off.

Pietrantoni did not take the matter to the district attorney to file on because he and his partners were still investigating the case and preparing reports. Subsequently, named codefendant Rafael Navarro (Navarro) and his girlfriend, Beatrice Sanchez (Sanchez), were also interviewed separately on Monday. Although Navarro had been implicated by Lozoya during his questioning, Navarro's connection to the case began weeks earlier when the officers located the green Pinto used by the assailants parked in front of the Navarro family home. After Navarro submitted to a polygraph examination, the officers spoke to Sanchez. The officers then interviewed Navarro again, who, when advised of Sanchez's statements, implicated Lozoya.

Following the Navarro interviews, Lozoya was again interviewed by Pietrantoni on Monday, February 10, at 4:45 p.m. This interview occurred beyond the statutory arraignment period of Penal Code section 825.[3] This time, Lozoya stated he believed Mosby was responsible for the robbery at the Mendez home. He related that on the evening of January 11, 1986, he and several of his gang members drove around in the green Pinto searching for Mosby. Lozoya admitted stabbing Mosby upon locating him near 131st and Vermont. Lozoya then led officers to his home and gave them the knife used. He signed a summary of his statements at 8:50 p.m.

A complaint was filed and Lozoya was arraigned Tuesday, February 11.

---

[3]All subsequent code section references are to the Penal Code, unless otherwise indicated.

At the preliminary hearing, the magistrate suppressed statements obtained from Lozoya on the first and second day of his custody because police tactics were "reprehensible" and involved improper use of threats and promises. The magistrate ruled Lozoya should have been arraigned by 3:15 p.m., Monday, February 10, prior to the confession.

Nonetheless, the magistrate ruled the Monday evening confession admissible, finding "Lozoya, after hearing that he had been implicated by Navarro, . . . confessed to being the one that stabbed the victim." The confession was determined to be voluntary, as it came "from an independent source cut off completely from the improper interviews and the threats and promises that had been made on Thursday and Friday by [Youngblood] as well [as] . . . Pietrantoni."

Lozoya and Navarro were thus held to answer for the Mosby killing.

An information was filed alleging Lozoya and Navarro violated one count of section 187, subdivision (a), and Lozoya personally used a deadly and dangerous weapon, to wit, a knife, in the commission of said offense, within the meaning of section 12022, subdivision (b). In addition, there was a prior prison term allegation (§ 667.5, subd. (b)) against Lozoya.

The superior court denied Lozoya's section 995 motion to set aside the information. Lozoya then sought a writ of prohibition to restrain further criminal proceedings against him on the ground he was unlawfully committed. This court issued an alternative writ.

### CONTENTIONS

Lozoya contends: (1) he was arrested without probable cause; (2) all his statements should have been suppressed as fruits of an illegal arrest and as the result of improper threats and promises by the police; (3) without these statements, there was no probable cause to hold him to answer; and (4) the delay in arraignment was prejudicial.

 ### DISCUSSION[4]

1. *Standard of appellate review.*

A defendant has been held to answer without probable cause if the commitment is based entirely on incompetent evidence. Accordingly, in such a case, the trial court should grant a motion to set aside the information. (*Priestly* v. *Superior Court* (1958) 50 Cal.2d 812, 815 [330 P.2d 39].)

---

[4]The section 995 motion was denied on July 21, 1986, and the petition was filed August 6, 1986. Section 999a provides "[a] petition for writ of prohibition, . . . , must be filed in the

In proceedings under section 995, the magistrate is the finder of fact. The superior court sits as a reviewing court and must draw every legitimate inference in favor of the information. It cannot substitute its judgment as to the credibility or weight of the evidence for that of the magistrate. On review by appeal or writ, the appellate court in effect disregards the ruling of the superior court and directly reviews the determination of the magistrate holding the defendant to answer. (*People* v. *Laiwa* (1983) 34 Cal.3d 711, 718 [195 Cal.Rptr. 503, 669 P.2d 1278].)

2. *The arrest was unsupported by probable cause, tainting evidence which flowed from it.*

a. *The Thursday morning arrest was illegal because it was not based on probable cause.*

As indicated, Pietrantoni testified, and the People concede, that Lozoya was not free to leave at 10:30 a.m. or so on Thursday morning, at the time Lozoya agreed to go to the station for questioning. At that point in the investigation, the officers were not sure whether Lozoya was a witness or a suspect. However, the magistrate found the arrest occurred at 3:15 p.m. on Thursday, because it was then, after Pietrantoni heard what Lozoya told Youngblood at the polygraph examination, that the decision to arrest was made.

The ruling was error. In *Dunaway* v. *New York* (1979) 442 U.S. 200, 203 [60 L.Ed.2d 824, 829-830, 99 S.Ct. 2248], without enough information for an arrest warrant, the police picked up the petitioner and took him into custody for questioning. Although he was not told he was under arrest, the petitioner would have been physically restrained had he attempted to leave. (*Ibid.*) Petitioner waived counsel and eventually incriminated himself in an attempted robbery and murder. (*Ibid.*) The United States Supreme Court pronounced "detention for custodial interrogation—regardless of its label—intrudes so severely on interests protected by the Fourth Amendment as necessarily to trigger the traditional safeguards against illegal arrest." (*Id.,* at p. 216 [60 L.Ed.2d at p. 838].) Accordingly, *Dunaway* held the Fourth and Fourteenth Amendments are violated where, in the absence of probable cause, a suspect is seized and transported to the police station for interrogation. (Ibid.)

appellate court within 15 days after a motion made under Section 995 . . . , has been denied by the trial court." This petition is file stamped on the 16th day after the denial of the section 995 motion. Although file stamped on August 6, 1986, the cover of the petition also shows a stamped date of August 5, 1986. Defendant's attorney has filed a declaration that the petition was presented for filing in the clerk's office before 5 p.m. on August 5, 1986. According to our clerk's office, the petition was received on August 5, 1986, but filed the next day. Thus, the petition is not time barred and the issues presented are considered on the merits.

■ There is no suggestion in the instant case that probable cause existed at that critical point. As in *Dunaway,* the detention was investigatory only, executed in the hope that something might turn up. (*Ibid.*)

b. *The Thursday afternoon arrest was illegal because Lozoya's statements to Youngblood were unlawfully obtained, barring their use for probable cause.*

■ The magistrate suppressed Lozoya's statements made to Youngblood because of the latter's egregious conduct. Those statements were unlawfully obtained because of Youngblood's tactics and further, because they were the fruit of the improper custody of Lozoya. But even assuming, as the magistrate found, that Lozoya was not arrested until 3:15 p.m., with the suppression of Lozoya's statements to Youngblood, a postpolygraph arrest would be lacking in probable cause.

It is fundamental that convictions supported by fruits of illegal government conduct are outlawed, " 'because they encourage the kind of society that is obnoxious to free [people].' [Citations.]" (*People* v. *Bilderbach* (1965) 62 Cal.2d 757, 764 [44 Cal. 313, 401 P.2d 921].)

"The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the court, but that *it shall not be used at all.* Of course this does not mean that the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others, but the knowledge gained by the government's own wrong cannot be used by it in the way proposed." (*Silverthorne Lumber Co.* v. *United States* (1920) 251 U.S. 385, 392 [64 L.Ed. 319, 321, 405 S.Ct. 182, 24 A.L.R. 1425], italics added.)

Accordingly, *People* v. *Maxwell* (1978) 78 Cal.App.3d 124, 131-132, held information obtained by unlawful police conduct is " 'fruit of the poisonous tree' " which cannot be added to the equation of probable cause. Consequently, a 3:15 p.m. arrest of Lozoya based on inadmissible statements made to Youngblood would have been lacking in probable cause.[5]

Because the arrest of Lozoya was illegal, all evidence which flowed from

---

[5]The superior court denied the section 995 motion, but invited further briefing on the issue of whether Lozoya's inadmissible statements to Youngblood could be used for probable cause. No additional briefing was submitted. The People contend there was therefore no final ruling on this issue, making writ review premature. The lack of supplemental briefing does not disturb the finality of the trial court's ruling. It merely indicates Lozoya's counsel apparently concluded there was nothing more which could be brought before the superior court.

exploitation of that illegality was tainted " 'fruit of the poisonous tree.' " (*Wong Sun* v. *United States* (1963) 371 U.S. 471, 487-488 [9 L.Ed.2d 441, 445, 83 S.Ct. 407].) Due to the improper police conduct, the magistrate suppressed, in addition to Lozoya's statements to Youngblood, all postarrest statements on Thursday and Friday.

However, the magistrate allowed in the pivotal confession of Monday evening, finding it was a voluntary act sufficient to attenuate the preceding taint. It is to that confession that we now turn.

3. *The magistrate's finding of attenuation is unsupported by the record.*

a. *General principles.*

In *Wong Sun,* the Supreme Court pronounced the principles to be applied where the issue is whether statements and other evidence obtained after an illegal arrest should be excluded. Not "all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' " (*Id.,* at pp. 487-488 [9 L.Ed.2d at p. 455].)

*Brown* v. *Illinois* (1975) 422 U.S. 590, 603-604 [45 L.Ed.2d 416, 427, 95 S.Ct. 2254], held "[t]he question whether a confession is the product of a free will under *Wong Sun* must be answered on the facts of each case. *No single fact is dispositive.* The workings of the human mind are too complex, and the possibilities of misconduct too diverse, to permit protection of the Fourth Amendment to turn on such a talismanic test. The *Miranda* warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest. But they are not the only factor to be considered. The temporal proximity of the arrest and the confession, [fn. omitted] the presence of intervening circumstances, [citation], *and, particularly, the purpose and flagrancy* of the official misconduct [fn. omitted] are all relevant. [Citation.] The voluntariness of the statement is a threshold requirement. [Citation.] And the burden of showing admissibility rests, of course, on the prosecution. [Fn. omitted.]" (Italics added.)

The temporal factor is an ambiguous one. While a short lapse of time may not suffice to purge the initial taint (*Rawlings* v. *Kentucky* (1980) 448 U.S. 98, 107 [65 L.Ed.2d 633, 643, 100 S.Ct. 2556]), a prolonged detention may well be a more serious exploitation of an illegal arrest than a short one.

(*Dunaway* v. *New York, supra,* 442 U.S. at p. 220 [60 L.Ed.2d at p. 841] (conc. opn. of Stevens, J.).)

"[T]he degree of 'attenuation' which suffices to remove the taint from evidence obtained as a result of unlawful police conduct requires at least an intervening independent act by the defendant or a third party which breaks the causal chain linking illegality and evidence in such a way that the evidence is not in fact obtained by exploitation of that illegality. [Citation.] The defendant's [confession], if sufficiently an act of free will to purge the primary taint of the unlawful conduct, may produce the requisite degree of attenuation. (*Wong Sun* v. *United States, supra,* 371 U.S. 471 , at p. 486 [9 L.Ed.2d 441, at p. 454]; . . .)"[6] (*In re Peter G.* (1980) 110 Cal.App.3d 576, 585 [168 Cal.Rptr. 3].)

 b. *Application here.*

"It is, . . . , well recognized that the issue whether the taint flowing from the illegal police conduct had been adequately purged or dissipated is a factual matter . . . to be determined by the trier of fact. (*People* v. *Sesslin* [(1968]) 68 Cal.2d 418 , at p. 429.)" (*In re Peter G., supra,* 110 Cal.App.3d at p. 586.)

 Here, the magistrate concluded: "[Sanchez] implicated Navarro and Lozoya. Navarro was played a copy of the tape. He imlicated Mr. Lozoya. And Lozoya, *after hearing that he had been implicated by Navarro,* then confessed to being the one that stabbed the victim. [¶] Under the circumstances I believe the confession at that time was voluntary. *And it came from an independent source* cut off completely from the improper interviews and the threats and promises that had been made on Thursday and Friday by the polygraph operator as well [as] Officer Pietrantoni." (Italics added.)

The magistrate's rendition of the facts is unsupported by the record.

The following colloquy occurred between Lozoya's counsel and Pietrantoni on cross-examination at the preliminary hearing: "Q Prior to this second conversation with Mr Lozoya on the 10th, meaning the one that took place in the early evening, prior to that time you had had an interview and done a polygraph examination with Mr. Navarro. Is that correct?

---

[6]"[I]n *Wong Sun* a statement was held inadmissible because it had been elicited from a defendant contemporaneously with an unlawful arrest, but a statement taken from a second defendant, also unlawfully arrested, was held to be admissible because that defendant had voluntarily returned several days after his arraignment and release to confess his involvement in the criminal conduct for which he had been arrested." (*People* v. *DeVaughn* (1977) 18 Cal.3d 889, 897 [135 Cal.Rptr. 786, 558 P.2d 872].)

"A. Yes.

"Q. Before you entered [*sic*] Mr. Lozoya in the evening of the 10th, did you tell him the contents, or did you tell him what Mr. Navarro had said in his interviews?

"A. I believe we probably discussed several interviews with him. Whether we discussed specifically Mr. Navarro's matter, I'm not actually sure."

The issue was later further explored on re-cross: "Q Isn't it a fact that after—well, you indicated yesterday that having a conversation with Mr. Navarro on February 10 you thereupon, prior to talking with Mr. Lozoya the evening of the 10th, you had either confronted him or reviewed what Mr. Navarro had told you. Isn't that correct?[7] [8]

"A. Yes.

"Q. In the taped conversation of the evening hours of February 10 with Mr. Lozoya on the tape itself there is no direct reference or indication that the tape was played — strike that.

"Backing up a little bit, did you play the tape that you had made of Mr. Navarro's statements to Mr. Lozoya?

"A. I don't believe so.

"Q. Did you then merely discuss what he had told you in that taped conversation with Mr. Lozoya?

"A. I don't know how we approached Mr. Lozoya regarding—That's why I made the reference to between reviewed and confronted. We may have just asked him to clarify the parties involved again.

"Q. However, on the tape recording of the conversation between the detectives and Mr. Lozoya in the evening hours of February 10 there is not

---

[7]This question assumes a fact not in evidence. As set forth above, Pietrantoni earlier stated on cross-examination that he was not sure whether he had discussed Navarro's matter with Lozoya prior to the confession.

[8]"Confrontation" is obviously used here colloquially, rather than in the legal sense of setting a witness face to face with a defendant, in order that the latter may make any objection to the witness and engage in cross-examination. (See Black's Law Dict. (5th ed. 1979) p. 272, col. 1.)

direct reference on the tape by anyone to the tape of Mr. Navarro's statements. Isn't that correct?

"A. Yes.

"Q. I assume then that your asking or referring in some manner to Mr. Navarro's statements was done prior to the afternoon tape recording process?

"A. Possibly.

"Q. Do you recall asking Mr. Lozoya any questions prior to turning the tape on?

"A. I recall having a discussion with him. As far as specifics, no.

"Q. Do you recall how long that conversation was?

"A. No.

"Q. Did you attempt, did you indicate to him anything [sic] the lines of, 'Well, Mr. Navarro has told us that you and he were involved. And I want you to tell us that'?

"A I don't recall saying that."

This record reflects that Pietrantoni was not even sure he discussed the Navarro conversation with Lozoya, that Pietrantoni did not play Navarro's taped conversation for Lozoya, and that no mention was made of Navarro's statements on Lozoya's later taped conversation.

The record thus discloses that Pietrantoni's responses with regard to whether he had presented Lozoya with Navarro's statements were at best, inconclusive.[9]

The magistrate's finding that "Lozoya, after hearing that he had been implicated by Navarro, then confessed to being the one that stabbed the victim[,]" is not supported by the evidence received at the preliminary hearing. Nor is there any support for the finding that the confession came from an independent source. Because on this record, the finding of attenuation cannot stand, the confession and the knife must be suppressed as fruits

---

[9]At oral argument, the People conceded the record contains no further evidence which could support the magistrate's finding of attenuation.

of an illegal arrest. Absent those items, the evidence is insufficient to sustain the commitment. The information must therefore be set aside.

█ We do not reach the issue of delayed arraignment, except to note that such delay does not immunize a defendant from prosecution. (*People* v. *Morse* (1970) 4 Cal.App.3d Supp. 7, 8-10 [84 Cal.Rptr. 703].)

 c. *No attenuation possible here as a matter of law.*

█ Even assuming Lozoya's confession resulted from his being presented with Navarro's statements, as a matter of law no attenuation could have occurred here.

Examination of cases where a defendant's statements or other evidence are held admissible due to attenuation reveals that such evidence is typically the product of *happenstance,* but not the *desired* result of official misconduct. The facts of the seminal case of *Wong Sun* are summarized at footnote 6, *ante.* In *Rawlings* v. *Kentucky, supra,* 448 U.S. at page 108 [65 L.Ed.2d at p. 644], the "petitioner's admissions were apparently spontaneous reactions to the discovery of his drugs" in a purse belonging to a third party, and as such "weigh[ed] heavily in favor of a finding that petitioner acted 'of free will unaffected by the initial illegality.' " (*Ibid.*)

In *People* v. *Caratti* (1980) 103 Cal.App.3d 847 [163 Cal.Rptr. 265], likewise no exploitation of the primary illegality took place. There, the police unlawfully searched appellant's car, found, and seized drugs, but did not arrest appellant because they knew the search had been illegal and they would be unable to prosecute. Subsequently, appellant sold drugs to an undercover officer, was arrested, and pled guilty to a possession charge. The *Caratti* court rejected appellant's contention that the contraband sold to the officer was a fruit of the prior illegal search, holding the decision to sell drugs to the officer was an intervening independent act sufficient to dissipate the taint. (*Id.,* at pp. 850-852.) The court acknowledged the police focused upon appellant as a result of the search of his car, but held there was no legally cognizable exploitation of the illegality, and appellant's volitional act was the proximate cause of his arrest and conviction. (*Id.,* at p. 852.)

In re *Peter G., supra,* 110 Cal.App.3d at page 581, presented the fact situation of a minor appellant being questioned by police, when another officer entered the interview room holding a screwdriver with which a victim had been stabbed. The appellant asked this officer what he was doing with appellant's screwdriver. (*Ibid.*) His convictions of attempted robbery and assault were reversed because an independent examination of the evidence led to

the conclusion the appellant lacked the ability to waive his *Miranda* rights. (*Id.,* at p. 585.)

However, the *Peter G.* court ordered that upon retrial, the trial court should determine whether appellant's spontaneous statement acknowledging ownership of the screwdriver constituted a sufficiently free and voluntary act which attenuated or purged the taint of the improper interrogation, "*or whether his statement was the result of a police ploy inducing him to make further incriminating statements by bringing in and exhibiting the screwdriver in his presence.*" (*Id.,* at p. 586, italics added.)

*In re Jorge S.* (1977) 74 Cal.App.3d 852, 860 [141 Cal.Rptr. 722], found there was no attenuation where it was "apparent that the *purpose* of the official misconduct was directed toward obtaining an admission of criminal conduct." (Italics added.)

Precisely the same is true here. Assuming arguendo the officers actually presented Lozoya with Navarro's statements, their conduct was wholly purposeful, with an eye toward finally extracting a confession from Lozoya. Rather than being attenuated, such a confession would have been the result of the ongoing exploitation of the primary illegality.

## CONCLUSION

We are mindful of the gravity of the charge herein, and further that Lozoya confessed to the stabbing and led police to the knife used. However, probable cause was lacking at the time of the arrest. Even assuming the arrest did not occur until 3:15 p.m. Thursday afternoon, the magistrate suppressed Lozoya's statements to Youngblood, which statements cannot be used to establish probable cause.

The magistrate's finding that Lozoya confessed upon being presented with Navarro's statements implicating him is not supported by this record. At best, Pietrantoni's responses upon which the magistrate's ruling rested, were inconclusive. Accordingly, this record cannot support a finding that the taint was attenuated.

Even assuming the events transpired as the magistrate found, rather than being attenuated, the confession would have been nothing more than the product of a continued exploitation of the initial illegality. Due to the lack of attenuation, the confession and the knife as "fruits" of the illegal arrest, must be suppressed.[10]

---

[10]The Right to Truth-in-Evidence provision of California Constitution, article I, section 28, subdivision (d), "permit[s] exclusion of relevant, but unlawfully obtained evidence, only if exclusion is required by the United States Constitution . . . ." (*In re Lance W.* (1985) 37 Cal.3d 873, 890 [210 Cal.Rptr. 631, 694 P.2d 744].) The exclusion here is compelled by federal standards.

## DISPOSITION

The alternative writ having served its purpose is discharged. Let a writ of prohibition issue directing the superior court to set aside its order denying Lozoya's section 995 motion and issue a new and different order granting the motion.

Danielson, J., and Arabian, J., concurred.