# STATE OF FLORIDA v. VAZQUEZ
## Case No. 83-5949 CF A
Seventeenth Judicial Circuit, Broward Cty.

December 15, 1983

### APPEARANCES OF COUNSEL

**John Howes** for plaintiff.

**William R. Tunkey** for defendant.

### OPINION OF THE COURT

J. LEONARD FLEET, Circuit Judge.

### *ORDER ON MOTION TO SUPPRESS*

THIS CAUSE came on to be heard upon the Motion to Suppress filed in the above entitled matter by Defendant Jorge Felix Vazquez (hereinafter referred to as Vazquez). This Court has heard testimony from the accused as well as witnesses called by the State of Florida, all of which testimony was addressed to the hold issue of whether or not Vazquez was possessed of the requisite legal right to challenge the

legality of the search of the watercraft in which was found a large quantity of marijuana. For the reasons outlined below, the Motion to Suppress of Vazquez is DENIED.

## FACTS

During the early morning hours of June 4, 1983, a United States Air Force Coast Guard jet aircraft, operated by Lieutenants Crawford and Skirchak, were on routine patrol over the ocean a short distance due east of Broward County. These gentlemen observed a pleasure craft, about thirty feet in length, traveling in a westerly direction, which left behind it a substantial amount of white water, thereby indicating that the boat was either traveling very fast or was very heavy. Flying at an altitude of about 100 feet to 150 feet, in an aircraft clearly marked as being a part of the Coast Guard, several passes were made at the boat.

During these passes, transmission was made by both radio and loud hailer (the latter being a loud speaker device designed to permit the listener to hear voice transmission above the noise of the aircraft) requesting the boat to contact the aircraft on Channel 16; all such efforts were in vain. During these passes it was determined that the boat was moving at about eight knots per hour, thus indicating that the white water being generated by the boat was due to its weight rather than its speed. The white water factor, coupled with the early hour at which a pleasure craft would be headed towards the Florida coast, caused the airborne Coast Guardsmen to radio their base in Hialeah for assistance in making contact with the target boat for the purpose of further investigation. There being no Coast Guard ship available to render the requested assistance, contact was made with Pompano Beach Police Department by way of telephone patch in the aircraft.

Pompano Beach Police Department was advised by Lt. Skirchak that the suspected boat was riding low in the water, heading due west at an unusually early hour of the day and that the boat should be boarded for the purpose of a safety evaluation. The Coast Guard kept the target boat under surveillance by flying low, slow circles around it; information concerning its direction of travel was transmitted to the Pompano Beach police as the boat approached the Hillsboro Inlet to the Intercoastal Waterway.

Pompano Beach Police Headquarters alerted several of its officers and arranged for surveillance by both land and water. Amongst the many officers that were watching the movement of the suspect boat was Officer Solomon, who was positioned on the north bank of the Intercoastal Waterway on a walkway that is constructed under the Hillsboro Inlet Bridge. Officer Solomon testified that the boat, with

**25**

what she thought were two white males and one white female on board, passed under the bridge traveling in a northerly direction. Just after the boat passed the bridge, it made a circle and then commenced to travel in a westerly direction on a channel that led inland. One of the men was said to possess a beard and to be wearing no shirt; the other man was observed to have no beard and was wearing a green shirt.

Pompano Beach Detective John Page testified that he was on board a chase boat, with two uniformed officers from his department, that arrived at Hillsboro Inlet about twenty minutes after he first received the alert that his help was needed. When at the Inlet, he saw the Coast Guard aircraft and was able to read its identifying numbers and label painted on the fuselage and wings. At the time he observed the aircraft, he also observed the suspect boat traveling at a speed he estimated to be not in excess of 10 knots per hour by displacing a heavy wake nonetheless.

The suspect boat was observed to proceed in a westerly direction in a channel that led inland. The target boat passed Lighthouse Marina and then pulled into a dock near an empty lot, later identified as the parking lot for Cap's Restaurant. From a distance of not more than 700 yards, Detective Page saw two men leap from the target boat and start running away from the point of docking. Neither of the men were observed to have secured the boat before they leaped ashore. A man in a green shirt was seen to run in a westerly direction atop the seawall and the other man ran in a southerly direction between the condominium buildings lining the shore. Detective Page chased after the man in the green shirt, who was observed to leave the seawall and disappear among the condominium buildings.

Although he lost sight of the individual he was chasing, Detective Page began a careful search of the area during the course of which he entered the electrical meter room of one of the condominiums. In the rafters of the meter room Detective Page discovered the man he was chasing, identified in court as the Defendant Vazquez. Upon being directed to do so, the Defendant came down from his hiding place after which he was handcuffed and returned to the boat from which Detective Page had seen him leap ashore.

Officer Barry Lindquist of the Pompano Beach Police Department testified that he was piloting the chase boat on which Detective Page was a passenger. He generally corroborated Detective Page's testimony about the chase. In addition, Officer Lindquist informed the Court that the target boat, when he saw the two men leap ashore at Cap's parking

26

lot, was not secured to the available dock, although one line had been thrown loosely around a piling. As a result of the lack of mooring, the target boat was beginning to drift back into the channel from which it had come.

Sergeant Philip Johns of the Pompano Beach Police Department testified that he was in a second chase boat. He corroborated the testimony of his fellow officers concerning his observations about the chase of the suspect boat. Upon seeing one person leap ashore from the suspect boat and no mooring being completed, Sergeant Johns directed his driver to discharge him at the dock by the suspect boat in order that said boat could be secured. His order being obeyed, Sergeant Johns was successful in mooring the suspect boat before it slipped into the channel and became a possible hazard to navigation. It was after this activity that Detective Page returned to the dock with Defendant Vazquez.

The Defendant, who testified before any of the law enforcement officers took the stand, stated that he and his codefendant were the only two persons on board the suspect boat when it was out in the ocean and when it later docked at the place above described. He acknowledged that he had leaped ashore from the boat and had run along the seawall in an effort to escape capture by the police. The reason for his flight was that he was aware of the nature of the cargo of the ship and did not want to be associated with the marijuana. His testimony about running into the electric meter room and subsequently being discovered, after which he was handcuffed and returned to the suspect boat, did not vary in any material respect from that of Detective Page. Similarly, the testimony of Defendant Vazquez concerning the sighting by the Coast Guard Aircraft, the entry into the Intercoastal Waterway by way of Hillsboro Inlet, the run up the channel past Lighthouse Marina and the subsequent docking and escape from the target boat was all consistent with that of the witnesses called by the State of Florida.

## LAW

Before one may assert a claimed violation of the Fourth Amendment to the United States Constitution, one must affirmatively allege and prove a legally recognized right to do so. *Morales v. State*, 407 So.2d 321 (Fla. 3 DCA, 1981). Such legally recognized right, commonly referred to as "standing", is defined by *United States v. Salvucci*, 448 U.S. 83 (1980) and *Rawlings v. Kentucky*, 448 U.S. 98 (1980) as being possessed of a reasonable expectation of privacy in the place searched. In the absence of the assertion, and proof, of such reasonable expecta-

tion of privacy by the complaining party, the evidence obtained by the challenged search may be utilized in the prosecution of the complaining party, assuming no other impediment to its use exists.

Assuming that one is legitimately on the premises searched, such presence, without more, does not confer "standing" although the legitimacy of such presence is a factor to be considered in connection with other evidence. *Rakas v. Illinois,* 439 U.S. 128 (1978); *Inchaustegui v. State,* 392 So.2d 319 (Fla. 4 DCA, 1981). The Defendant has not suggested to the Court that he is possessed of any ownership interest in the boat searched, thereby obviating that issue as a justification for his Motion to Suppress. *Boykin v. State,* 421 So.2d 538 (Fla. 5 DCA, 1982) at fn. 3; *Rizzo v. State ex rel City of Pompano Beach,* 396 So.2d 869 (Fla. 4 DCA, 1981). Similarly, the absence of an assertion of being the captain of the suspect boat renders inapplicable such principle as the basis for conferring standing upon the Defendant herein. *Lavely v. State,* 422 So.2d 975 (Fla. 4 DCA, 1982).

Assuming, solely for the basis of discussion, that Defendant was initially possessed of a legally recognized basis upon which he could predicate his Fourth Amendment challenge, did he, by his own voluntary actions, dispossess himself thereof? The Court is of the opinion that, for the reasons that hereafter follow, he forfeited any vestige of "standing" when he leaped ashore and ran from the boat at Cap's parking lot dock.

From all of the testimony adduced before the Court, including the express statement of the accused that he ran from the boat because did not want to be captured by the police, it is clear that the suspect boat, and its illegal cargo, were abandoned by Defendant Vazquez. The concept of abandonment is succinctly discussed in Volume I, Florida Jurisprudence Second, commencing at page six, viz.:

> " 'Abandonment,' in its general sense, means the act of intentionally relinquishing a known right absolutely and without reference to any particular person or for any particular purpose; abandoned property is that to which the owner has voluntarily relinquished all right, title, claim, and possession, with the intention of terminating his ownership, but without vesting it in any other person and with the intention of not reclaiming future possession or resuming its ownership, possession, or enjoyment.
>
> "Renunciation of property requires both the intention to abandon and the external action. There must be a voluntary intention to abandon, *or evidence from which such intention may be presumed.* In order to establish an abandonment of property, actual acts of

28

relinquishment accompanied by an intention to abandon must be shown." (emphasis added)

It is clear to the Court that the actions of Defendant Vazquez met each and every element of the proof required to establish his abandonment of the boat. The icing on the cake on this issue is the testimony of the accused, himself, that he wanted to elude association with the boat and its cargo. The act of a suspect in hastily leaving the scene of a confrontation with a law enforcement officer without saying a word to such officer sufficiently evidences an intention to abandon the vehicle occupied by the suspect at the time of such confrontation. *State v. Lawson*, 394 So.2d 1139 (Fla. 4 DCA, 1981); *State v. Davis*, 415 So.2d 82 (Fla. 4 DCA, 1982) and cases cited therein at page 83.

## CONCLUSION

For the reasons set forth above, it is, upon consideration thereof,

ORDERED and ADJUDGED that the Motion to Suppress of Defendant Vazquez be, and the same hereby is, DENIED.