OPINION OF THE COURT
John P. Callanan, Sr., J.
On September 26, 1984, the Ardsley Police Department had contact with Liz Darconte, who informed them of the location of certain articles. The message indicated utilization of an abandoned motor vehicle by Adam Klein for placement of jewelry, papers and other articles in an apartment parking lot. On Thursday, September 27, 1984, the Ardsley police and the Town of Greenburgh police searched the vehicle and removed some of the jewelry and other property therefrom. In a Mapp hearing, it was determined that Adam Klein did not have standing to challenge such search and seizure since he did not own the vehicle nor have any permission to use the same.
*550 On September 27, 1984, it was determined that a positive fingerprint identification of the defendant had been made at one of the burglarized houses.
On Thursday, September 27, Adam Klein was alone in the apartment of Kittie Smith and her family. Adam Klein had been living with the Smiths for a period of at least three weeks and had lived with them off and on for extended periods of time over the preceding two years. At approximately 11:30 a.m., he received a telephone call from one Joseph Palamara, who told him that Sergeant D’Aliso of the Ardsley Police Department was harassing Palamara’s girlfriend, Liz Darconte, at her place of employment over alleged burglaries that Adam Klein had committed. Adam Klein immediately called the Greenburgh Police Station and asked for the detective division to discuss the alleged harassment with some of his acquaintances in that department. He talked with Sergeant Sullivan, who purposefully kept the defendant on the telephone while other members of the department went to the Smith apartment to arrest the defendant. During the telephone conversation, the defendant specifically told the sergeant that at that moment he was in The Bronx. This misinformation was to avoid contact by the Greenburgh police which the defendant did not want.
Simultaneously with said telephone call, Detective Bonaiuto of the Greenburgh Police Department was on his way to the Smith apartment with knowledge that the defendant was being kept on the telephone by police headquarters to keep him available. Detective Bonaiuto had known Adam Klein in and around the community and through his police work for approximately six years. On the day of the arrest, the detective was aware that Adam Klein was staying at the Smith apartment. There was no warrant of arrest or no search warrant either applied for or obtained against Adam Klein or the Smith apartment by any of the police agencies involved.
Upon arriving at the Smith apartment with at least one other policeman, Detective Bonaiuto knocked on the door and, according to his version, the defendant called out, "Who is it,” and the detective answered, "It’s Jack,” and then the defendant opened the door and the police entered and proceeded with the arrest. The defendant testified that upon hearing the knock, he called out, "Come in,” which was the custom at the Smith apartment and was utilized because of his involvement with the phone call, after which the police opened the unlocked door and came in and made the arrest. The detective *551 told the defendant that he was under arrest for burglary, allowed him to retrieve a pack of cigarettes from the bedroom, and handcuffed him.
The defendant was taken to the Greenburgh Police Station, arriving there between 12:00 noon and 1:00 p.m. Upon arriving at the station, Detective Bonaiuto again informed the defendant of his rights and told him that he was under arrest for burglary. The defendant was allowed to make a telephone call, which he did to Frank Smith, the 22-year-old son of Kittie Smith who also lived in the Smith apartment. A waiver of rights statement was reviewed by the defendant at the request of Detective Anderson and signed by the defendant and witnessed by the detective prior to the beginning of interrogation. Contrary to the detective’s usual procedure, the questions concerning understanding the rights and wishing to talk to the police are not checked in the waiver portion of the document. The time of fingerprinting and processing defendant was not specifically determined at the hearing. The defendant was handcuffed by his right arm to a security bar and by his left arm to the chair that he was sitting on for most of the time that he was in the detectives’ squad room during most of the afternoon of the 27th.
The Greenburgh and Ardsley police officers returned to the Greenburgh Station sometime around 1:00 p.m. and Sergeant D’Aliso of the Ardsley Police Department interrogated the defendant concerning burglaries in Ardsley. The interrogation commenced at approximately 2:30 p.m. and continued with the signing of a statement by the defendant at approximately 3:55 p.m. The defendant was then interrogated by Detective Anderson of the Greenburgh Police Department from approximately 4:15 p.m. until between 5:30 and 5:45 p.m., during which defendant signed another statement. Before beginning the second interrogation, Detective Anderson read the defendant his rights. Following the two interrogations, the defendant was put in the holding cell for approximately two hours until 8:00 p.m. He was then taken by Detective Pennella and Officer Teahan of the Greenburgh police on a ride through the Village of Ardsley, the City of White Plains, and the Town of Greenburgh. By prearrangement, Detective D’Aliso and another Ardsley policeman met them at the Ardsley Police Station and accompanied them through Ardsley. The defendant directed the car to various homes in Ardsley and identified them as the site of earlier break-ins by the defendant and others. The Ardsley policemen were taken back to their *552 station and again by prearrangement Detective Scoca of the White Plains Police Department joined the Greenburgh police and the defendant in the car and rode through part of White Plains. Again the defendant gave directions and pointed out a home which he burglarized on an earlier occasion. Upon the return trip through Greenburgh, the defendant directed the two Greenburgh officers to a house in Greenburgh that he identified as the site of his earlier break-in. They arrived back at the Greenburgh Police Station at approximately 11:30 p.m. on September 27, and the defendant was returned to the holding cell. Between midnight and 1:00 a.m. he was taken to the County Jail.
On Friday, September 28, 1984, Patrolman Seba and Lieutenant Kardauskas brought Liz Darconte to the interview room of the County Jail and conferred with the defendant. At the end of the interview the defendant signed another statement concerning burglaries in White Plains.
Judge Katz of the Town Court of the Town of Greenburgh signed what he referred to as a commitment order sometime late in the day on September 27 which indicated that the defendant should be returned to his court on October 1, 1984 and set bail at $10,000. The court was not in session on the 27th or 28th because of the Jewish holidays and the Judge is confident that the order was signed at his home after he had been to religious services. The order was apparently signed on the basis of a felony complaint presented by the Town of Greenburgh Police Department.
The defendant did not appear in the Greenburgh Court or any other court on September 27, 28, 29 or 30. On October 1, 1984, the defendant was arraigned on the subject charges in the Town of Greenburgh Court by another Judge. The defendant is indigent and counsel has been assigned to represent him for these proceedings, but not before the arraignment on October 1.
Adam Klein has been involved with the law and the court system on prior occasions and is an acquaintance of many of the police officers in the Greenburgh department. He is 22 years old and, because of his stature, is appropriately nicknamed "Mouse.”
Two other individuals who were under simultaneous investigation for burglaries with this defendant, Lehman and Palamara, were both arrested by the Greenburgh police at approximately the same time as the defendant. Lehman was released *553 on $250 bail at approximately 11:30 p.m. on the 27th and Palamara on $250 bail on the 28th. It is unclear as to the time of their arraignments, but because of the felony charges they should not have been bailed by the desk officer procedure.
CONCLUSIONS OF LAW
Since the specific detailed analysis in Payton v New York (445 US 573) there has been no doubt that a warrantless arrest is not allowed inside a person’s home unless there are exigent circumstances or unless it is consensual. Both the US Constitution 4th Amendment and NY Constitution, article I, § 12 make it clear that the right of a person to be secure in his home should not be violated. The following language from Payton has been cited time and again for this basic premise: "[T]he Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.” (Payton v New York, 445 US 573, 590, supra.) Payton and all of the cases since Payton have made it abundantly clear that CPL 140.15 (4) is not to be taken literally when it indicates that a police officer may enter a premises in which he reasonably believes a person to be present when that premises is a home. There was absolutely no indication that the police thought or that the People now claim that there are any exigent circumstances existing that justified a warrantless arrest inside the defendant’s home. Nor is there any view of the circumstances surrounding the entry that could be interpreted as consensual. The officer did not announce his purpose at the home prior to the entry and in fact, in the simultaneous phone call, the defendant specifically endeavored to mislead the police as to his whereabouts so that they would not come and get him.
People v Levan (62 NY2d 139, 145 [1984]) determines that the fruits of an unlawful arrest should be suppressed. (See also, People v Anthony, 93 AD2d 892.) However, the United States Supreme Court and the courts of this State have developed a principle that makes it possible to utilize the fruits of such a search if circumstances have purged the initial taint. (See, Rawlings v Kentucky, 448 US 98; People v Graham, 90 AD2d 198.) To determine whether the taint had been purged, it is necessary to examine the motives and activity of the police and the circumstances between the arrest and the confessions and those surrounding the confessions. In the case *554 before the court, the circumstances following the arrest indicate an arrest at approximately noon, with the first interrogation and confession between 2:45 p.m. and 3:35 p.m., the second interrogation between 4:15 p.m. and 5:30 p.m., and the three-hour evening ride through three communities accompanied by oificers from three departments, ending about 11:00 p.m. There followed incarceration in the County Jail for a three-day period without any arraignment until the Monday morning following the Thursday arrest. Prior to the arrest, the defendant was purposefully kept on the telephone to keep him in his apartment until the arresting oificers could arrive at what the arresting ofiicer knew to be the defendant’s home. Though he was given his rights by the police on three occasions, and was allowed to make a phone call, the over-all obvious purpose of the police was a continuation of their investigation of burglaries in three communities, which had taken on a quickened pace with the information they received on the 26th and their search and seizure of the abandoned vehicle and articles therein on the morning of the 27th. As discussed hereinafter, their interrogation apparently was more vital to them than arranging for a timely arraignment of this defendant. There were no circumstances involving the arrest or the activity following the arrest that purged the proceedings of taint to the point where the statements should be usable. Therefore, all of the written and verbal statements, admissions and confessions made by the defendant should be suppressed because of the warrantless arrest inside his home. In addition to the unlawful arrest, the question of the lack of arraignment for four days establishes an additional ground for suppression. It is basic statutory law in our State that once a person is arrested he is to be produced in front of a court within a very short time. This is true of arrest on warrant or without a warrant. (CPL 120.90, 140.20.) Once the defendant in the subject case had been arrested on a felony, he could have been arraigned in any Town Court in the County of Westchester, any number of which would have been available to the police on September 27, the date of the arrest. (See, CPL 100.55 [6].) The necessity for prompt arraignment was thoroughly spelled out by Judge Katz, the Town Justice involved in this matter, in another case which also involved the Town of Greenburgh Police Department, People v Davis (118 Misc 2d 122 [1983]; see also, People v Bevilacqua, 45 NY2d 508, which involved prearraignment activity by the Greenburgh Police Department). This defendant should not have been kept in the *555 Greenburgh Police Station for approximately eight hours and then driven around the town, the village and the city for another three hours, and then taken to the County Jail for three days without ever having been taken in front of a court. This is so basic that citation of statutory and case law seems to be extraneous. The importance of arraignment and the Judge’s active participation in assuring the defendant of his rights at an early stage of the proceedings were completely circumvented by the activity of the police in this matter. In addition to the earlier grounds, the failure to arraign as done here is cause to suppress the statements, admissions and confessions of the defendant. (See, People v Dairsaw, 46 NY2d 739.)
DECISION AND ORDER
It is the order of this court that defendant’s motion for suppression pursuant to CPL 710.20 is hereby granted as to both the oral and written statements made by the defendant at any time during or subsequent to the arrest on September 27, 1984.