## 18920

The STATE, Respondent, v. Billy Gene DANIELS, Appellant.

(167 S. E. (2d) 621)

592

*Messrs. Paul J. Foster, Jr.,* and *Kenneth C. Porter,* of Greenville, *for Appellant,* ▮

*Messrs. B. O. Thompson, Jr., Solicitor,* and *H. F. Partee, Assistant Solicitor,* of Greenville, *for Respondent,* ▮

May 12, 1969.

LITTLEJOHN, Justice.

Albert B. Scott, an employee in charge of Herndon's Esso filling station near the City of Greenville, was held up and at gun point robbed by two men about 2 o'clock A. M. on April 14, 1967. After money was taken Scott was tied, hands and feet, with strips of cloth material. James Durham and Billy Gene Daniels were indicted and charged with the offense. When the case was tried James Durham was

dead; Billy Gene Daniels was convicted of armed robbery and sentenced. From this conviction he has appealed.

No contention is made that the evidence submitted to the jury is insufficient to warrant a conviction. All appellate issues relate to procedural matters and admissibility of evidence during the trial of the case.

Perhaps the question argued most seriously by counsel is as follows: Did the court err in admitting into evidence a strip of cloth identified in transcript as Q-5, when said evidence was obtained as a result of a warrantless search and seizure? Only so much of the evidence as is necessary to rule upon this question will be recited.

When county officers Harvey and Green investigated the armed robbery shortly after two o'clock in the morning they found that Scott had been tied with strips of cloth described as "a piece of shirt, light colored cloth, and sort of like an undershirt, similar to it," it was also described as "[p]ieces of cloth; part looked like off a towel material, and the other part was shirt material, both white." They kept the pieces of cloth for use as evidence.

At approximately four o'clock of the same morning two officers of the Greenville City Police Department stopped a Mustang automobile which failed to obey a red traffic light and which had no headlights burning. The driver was identified as James Durham and the only passenger was identified as Billy Gene Daniels. Durham was arrested and taken to the city police headquarters for booking on the two traffic violations. Since Daniels did not have a driver's license and accordingly could not drive the automobile, it was parked on a city street with the officers retaining the keys. Daniels was not arrested and was left free to go as he might choose.

By the time Durham arrived at city police headquarters the desk sergeant had learned that two armed robberies had occurred earlier in the area, and upon becoming suspicious of Durham and Daniels, had Daniels apprehended

and brought in. He was found near a night club within a few blocks of where Durham had been arrested. When Durham was arrested and booked he had a cloth around his neck. Later officers sought this but it disappeared after he was placed in a cell. The desk sergeant had the arresting officers bring the Mustang to city police headquarters.

Just before the Mustang arrived Officers Harvey and Green came to the city police headquarters. They were investigating the filling station robbery. They were shown the Mustang and looked with a flashlight through the window of the car from the outside and saw "a side of a shirt * * * laying in the back of the back seat in the floorboard with a pair of scissors on the seat." After observing the cloth and scissors from the outside Lt. Harvey opened the car door and removed and examined the articles. He did not search the car nor look in the glove compartment or trunk. The cloth found in the car, together with the cloth used to tie up the robbery victim was sent to the Federal Bureau of Investigation Laboratory and the testimony of a fiber expert revealed that the cloth used to tie up the victim was cut from the cloth found in the back of the Mustang. This evidence was very important, if not absolutely necessary, to factually make a jury issue of guilt.

Daniels' defense was alibi; in addition he denied being in Mustang at the time Durham was arrested for traffic violations.

The cloth material procured as described above from the Mustang was offered in evidence and admitted over timely objections of counsel for Daniels. It was the position of counsel that there was involved a search and seizure which was not incident to the arrest, and that the officers had no right to search the vehicle without a search warrant, which admittedly was not obtained. It was the position of the State that no search was involved and that the officers were justified in seizing the cloth material (after the same was seen and recognized as probably being relevant evidence) without the necessity of a search. In oral argument counsel for the

State has admitted that the seizure was not incident to the arrest, and bottoms justification for obtaining the cloth on the proposition that it was procured without the necessity of a search.

Ownership of the Mustang is not completely settled in the record. Durham at the time of the arrest is quoted as saying it belonged to his aunt. Daniels while on the stand testified that he formerly owned the same in the name of Mamie Cooley, a girl friend, but that she had turned it back to the finance company. In attempting to exclude the evidence found, no claim was made that Daniels owned any interest in the vehicle. He denied being in the car at the time of the arrest, but admitted that he and Durham lived in the same house.

Under Daniels' version it can only be said that he was a former owner of the car. By the State's version it can only be said that he rode in it recently. Inasmuch as the trial judge treated the objection to the evidence as though Daniels were an aggrieved person under the Fourth Amendment, we shall assume (without so deciding) that he had standing to object. Under each version of the testimony it can logically be argued that neither previous owners nor recent passengers of motor vehicles have standing to raise Fourth Amendment issues. It is difficult to envision an invasion of "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures * * *" (U. S. Const. Amend. IV) merely because one formerly owned a car or recently rode as a passenger in it. The evidence is not susceptible of the inference that Daniels had any interest in the car as owner, bailee or otherwise.

We are well aware of the fact that he was not required to claim ownership in order to claim Fourth Amendment rights. *Jones v. United States,* 362 U. S. 257, 80 S. Ct. 725, 4 L. Ed. (2d) 697 (1960). If there was an illegal search and seizure the fruits thereof would of course be inadmissible in State proceedings under the

rule laid down in *Mapp v. Ohio,* 367 U. S. 643, 81 S. Ct 1684, 6 L. Ed. (2d) 1081 (1961).

We agree with counsel for the State that the shirt and scissors were not procured as a result of a search or any unlawful conduct on the part of police officers. In *State v. Thomas,* 248 S. C. 573, 151 S. E. (2d) 855, 861 (1966), we held, "It is important to note that the provisions of the State and Federal Constitutions protect against 'unreasonable searches and seizures'. A seizure of what is in plain view, without a search * * * is not prohibited by either Constitution."

Here we have an automobile left of necessity on the public streets of the City of Greenville. At that place police officers and other citizens were free to observe the car and look through the windows and see the evidence which is the subject of objection. No improper conduct should be attributed to the city officers who took the car in off the street, and this is especially true after Durham became suspected of robbery, and might be legally detained incident thereto longer than was contemplated when only a traffic violation was involved.

After the car was brought to city headquarters, the officers and any other citizen permitted on the premises were at liberty to observe the car and look through the windows, and certainly looking through the windows does not amount to a search, any more than walking down the street and gazing in store windows amounts to a search of the store.

The shirt and scissors had been left at a place where they were easily seen. The use of a flashlight is of no real consequence. It is folly to say that observation with a flashlight is improper when one could, by waiting until daylight, see the same things without the aid of the light. In *United States v. Lee,* 274, U. S. 559, 47 S. Ct. 746, 71 L. Ed. (2d) 1202 (1927), the United States Supreme Court held that discovery of liquor by means of a searchlight did not amount to search. When property is left where persons can

gaze upon it without trespassing upon property rights, one claiming to be aggrieved cannot be heard to complain that his rights are violated.

It was the duty of Officer Harvey to investigate the robbery and to procure such evidence as he legally might find. He was where he had a right and duty to be. Since he had the right to be where he was and to see the shirt and scissors, and since he obviously recognized the shirt material as being probably connected with the robbery, he had the right and duty to seize it without a search warrant. It is of no real significance that it became necessary or at least advisable to send the cloth material to the FBI laboratory for more positive identification of the tie-up strips with the seized shirt. Officer Harvey testified that he did not search the automobile and did not look in the glove compartment or in the trunk. At that time Officer Harvey was not attempting to discover anything in particular. He was doing what any good officer will do, *to-wit,* observing everything in sight hoping to come up with a clue. He did not need a search warrant to look through the windows of the car. After he saw the evidence there was no need for a search and consequently no need for a search warrant.

Our holding is consistent with *Harris v. United States,* 390 U. S. 234, 88 S. Ct. 992, 19 L. Ed. (2d) 1067 (1968). The articles of clothing were "in the plain view of an officer who [had] a right to be in the position to have that view [and they] are subject to seizure and may be introduced in evidence." *Id.* at 236, 88 S. Ct. at 993. Search implies invasion and quest, and the constitutional prohibitions do not prohibit a seizure without a warrant where there is no need of a search. *State v. Morris,* 243 S. C. 225, 133 S. E. (2d) 744 (1963).

The cloth taken from the Mustang was properly admitted in evidence.

The second question raised by the defendant on this appeal concerns the admissibility of the testimony of a Mrs. Nix.

She testified that she was working in a diner in Greenville on the morning in question and that two men matching the description of Durham and Daniels entered the diner for a few minutes about 3:20 A. M. Mrs. Nix was robbed by the two men who entered the diner on the morning in question. Although she did not testify in the presence of the jury to having been robbed, the defendant argues that her testimony necessarily imparted to the jury the inference that she was robbed and that she believed the defendant to be one of the robbers.

The trial court and the prosecution took care to ██ limit Mrs. Nix's testimony to statements that would place the defendants Daniels and Durham together on the morning in question between the time of the robbery of the gasoline station and the time Durham was apprehended. Daniels had consistently denied that he was the passenger in the car at the time of Durham's arrest. But even if it be conceded that an inference from Mrs. Nix's testimony was that she was robbed by the defendant, there was no error. Evidence of another crime is competent to prove the specific crime charged when it tends to establish identity. *State v. Thomas,* 248 S. C. 573, 151 S. E. (2d) 855 (1966).

Next, defendant contends that a line of questions dealing with the defendant's conversations with his witnesses violated the attorney-client privilege. Specifically, the defendant says that the following question was tantamount to asking whether the defendant asked or told his lawyer to remain outside the room, and that such a statement to the lawyer is privileged.

"As a matter of fact, three times today you have taken two or three, or more, of your witnesses in a room back there and asked that your lawyer not be in there with you, haven't you?"

The trial court committed no error in ruling that █ the solicitor was not asking about communications between the defendant and his lawyer, but was asking about the defendant's conversations with his witnesses

in his lawyer's absence. The solicitor's obvious purpose was to lay the foundation for showing that the defendant had planned perjured testimony with his witnesses; the solicitor sought no testimony concerning communication between client and attorney, and it is apparent from the record that the attorney had no knowledge of the alleged conversations.

The final questions are stated by the defendant as follows:

"Did the Court err in admitting into evidence notes identified in transcript as Exhibits 4 and 5 when such notes were taken from a conference room utilized by the defendant, witnesses and defense attorneys and when such room was provided by the Solicitor? (Exception IV).

"Did the Court err by refusing new trial for defendant when transcript reflects that conference room provided by Solicitor was kept under surveillance by personnel of Solicitor's office thereby tainting the atmosphere of the defendant's right to a fair and impartial trial? (Exception V)."

During the course of the trial the defendant and his attorneys and witnesses were permitted to use one of the rooms in the offices provided by the county for the circuit solicitors. On one or more occasions during the trial, the defendant conferred with witnesses in this room in the absence of his lawyers. Two notes in the defendant's handwriting, admitted in evidence over defense objection, contained what purported to be instructions from the defendant to his witnesses. These notes were found in the room where the defendant conferred with his attorneys and witnesses.

The record shows that the office in question was one of a series of three offices. One of the offices is occupied by the solicitor's secretaries and it is necessary to go through this office to reach the second office, occupied by the County Investigator. It is necessary to go through both of the first two offices to reach the third office, which the defendant was permitted to use and in which the notes were found. A rest room is located off of the third office, and prose-

cution personnel pass through that office several times each day.

Daniels admits writing the two notes and giving one to defense witness Barbara White and one to defense witness George C. Harris. These witnesses left the notes in the third office. One was found on a table by the County Investigator and the other, torn in pieces, was found by a secretary in the wastepaper basket.

Daniels explained his conduct in giving the notes to the witnesses by contending in effect that he was refreshing their memory about things they had previously told him.

While the defendant admits that he can find no controlling authority on the question which he raises, he objects to the admissibility of the evidence and the failure of the court to grant a new trial on the broad grounds that he has been denied a fair trial.

The credibility of Daniels and of his witnesses was for the jury. The jury was entitled to know what took place between the defendant and the witnesses since it would assist them in evaluating the evidence and in determining what weight should be given to it.

We find no improper conduct on the part of the prosecution and hold that the evidence was properly admitted.

All exceptions are overruled and the lower court is

Affirmed.

Moss, C. J., and Lewis, Bussey and Brailsford, JJ., concur.