## 1706

The STATE, Respondent v. Steven Columbus AUSTIN, Appellant.

(409 S.E. (2d) 811)

Court of Appeals

*Asst. Appellate Defender Wanda H. Haile,* of *South Carolina Office of Appellate Defense,* Columbia, *for appellant.*

*Atty. Gen. T. Travis Medlock,* and *Asst. Atty. Gen. Harold M. Coombs, Jr.,* Columbia, and *Sol. Holman C. Gossett, Jr.,* Spartanburg, *for respondent.*

Heard Sept. 10, 1991.

Decided Oct. 7, 1991.

SANDERS, Chief Judge:

Defendant Steven Columbus Austin appeals his conviction for possession with intent to distribute marijuana. He argues that the trial judge erred in admitting certain evidence seized by the police as the result of a search. We remand.

## I.

## THE ISSUES

The evidence in question, a quantity of marijuana, was seized following the issuance of a search warrant. Mr. Austin's single exception presents the issues of whether the warrant was defective in violation of the Federal and State Constitutions. The trial judge ruled that the warrant was, indeed, defective, but that the evidence was, nevertheless, admissible under the so-called "good faith exception." The State argues that, even if the exception is not applicable, Mr. Austin did not have a reasonable expectation of privacy in the searched premises. Thus, the issues presented are: (1) whether the evidence should have been excluded under the Federal Constitution; (2) whether the evidence should have been excluded under the State Constitution; and (3) whether Mr. Austin had a reasonable expectation of privacy in the premises.[1]

## II.

## THE FEDERAL CONSTITUTION

The Fourth Amendment to the Federal Constitution is a

---

[1] Mr. Austin requested a pretrial hearing to determine whether the search warrant was proper "under the statute." Presumably, he had reference to the statute governing search warrants, codified as § 17-13-140 of the South Carolina Code of Laws. He made no reference at trial to either the Federal or State Constitutions. The State, however, conceded at oral argument that the trial judge treated his objection to the evidence as having been made on constitutional grounds. Our Supreme Court has recently said there is an open question as to whether the good faith exception applies to the statute. *State v. McKnight*, 291 S.C. 110, 352 S.E. (2d) 471 (1987). Curiously, neither Mr. Austin's exception nor his argument on appeal even mentions the statute. Because he has not made the argument, we cannot answer the question. Our Supreme Court has told us, in no uncertain terms, that we are allowed to address only those issues properly before us. *Carolina Business Brokers v. Strickland*, 300 S.C. 492, 388 S.E. (2d) 815 (1990).

straightforward piece of legal draftsmanship. Mincing no words, the Founding Fathers provided:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.[2]

Most people have little concern about the Fourth Amendment in their daily lives. They are rightly confident that their homes and businesses will not be ransacked by agents of the government. Accordingly, they tend to view the constitutional guarantee as an impediment to law enforcement and a benefit only to "the criminal element." They are not completely wrong. One impact of the Fourth Amendment is to make it more difficult to convict criminals. But, larger considerations should not be overlooked. A. Cox, *The Court and the Constitution* (1987).

Constitutional rights cannot be accorded to anybody unless they are accorded to everybody. *State v. Williams*, 285 S.C. 544, 331 S.E. (2d) 354 (Ct. App. 1985). Moreover, the Fourth Amendment was not written solely for ordinary times but also for periods of political upheaval. In times like these, only the constitutional safeguard, coupled with an effective sanction, keeps the storm trooper from the dissident's door. The framers of the Fourth Amendment lived in such times. *The Court and the Constitution.*

The King's ministers issued general warrants which did not specify who or what was sought or which premises were to be searched. Writs of assistance, a form of general warrant, were regularly used to ransack homes and businesses in the colonies. Writs issued in Massachusetts caused the riots which

---

[2] Other amendments are less elegantly drafted. The First Amendment provides five separate rights—freedom of religion, speech, the press, assembly, and freedom to petition the government—all in a single, nonstop, run-on sentence. In the words of moral philosopher Kurt Vonnegut: "It is as though a starving person, rescued at last, blurted out all the things he or she had dreamed of eating while staying barely alive on bread and water." K. Vonnegut, *Fates Worse Than Death* 74 (1991).

eventually led to the "shot heard 'round the world." According to John Adams: "'Then and there the Child Independence was born." J. Lieberman, *The Enduring Constitution* 287 (1987).[3]

Diverse personalities, from Brandeis to Traynor to Sam Ervin, have written eloquently on Fourth Amendment values.

Many years ago, Justice Brandeis wrote for the United States Supreme Court:

> Decency, security, and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperiled if it fails to observe the law scrupulously. Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy.

*Olmstead v. United States,* 277 U.S. 438, 485, 48 S. Ct. 564, 575, 72 L. Ed. 944 (1928) (dissenting opinion), *overruled, Katz v. United States,* 389 U.S. 347, 88 S. Ct. 507, 19 L. Ed. (2d) 576 (1967).

Thereafter, Chief Justice Traynor wrote for the California Supreme Court:

> [The criminal] does not go free because the constable blundered, but because the Constitutions prohibit securing the evidence against him. Their very provisions contemplate that it is preferable that some criminals go free than that the right of privacy of all the people be set at naught.

*People v. Cahan,* 44 Cal. (2d) 434, 449, 282 P. (2d) 905, 914 (1955).

More recently, Sam J. Ervin, Jr., formerly a justice on the North Carolina Supreme Court, wrote:

> The constitutional guarantee against unreasonable searches and seizures has its roots deeply implanted in the human heart, the common law of England, and tyran-

---

[3] For a more complete discussion of events leading to the adoption of the Fourth Amendment, *see* W. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* (2d ed. 1987).

nies perpetrated by government on the people of England and the colonies.

The oldest and deepest hunger of the human heart is for a place where one may dwell in peace and security and keep inviolate from public scrutiny one's innermost aspirations and thoughts, one's most intimate associations and communications, and one's most private activities. This truth was documented by Micah, the prophet, 2,700 years ago when he described the Mountain of the Lord as a place where "they shall sit every man under his own vine and fig tree and none shall make them afraid." (MICAH 4:4).

Ervin, *The Exclusionary Rule: An Essential Ingredient of The Fourth Amendment,* The True Bill (N.C. Bar Ass'n), vol. 5, No. 1, at 1-3 (1985), *quoted in State v. Carter,* 322 N.C. 709, 717-18, 370 S.E. (2d) 553, 558 (1988).

For more than three quarters of a century, the United States Supreme Court has given effect to the Fourth Amendment by declaring that evidence seized in an unconstitutional search must be excluded in federal criminal proceedings. *Weeks v. United States,* 232 U.S. 383, 34 S. Ct. 341, 58 L. Ed. 652 (1914).[4] In *Weeks,* the Court emphasized the importance of preserving not only the right of the individual but also the integrity of judicial proceedings. Needless to say, this exclusionary rule has never been without controversy.

In 1949, the Court applied the Fourth Amendment proscription against unreasonable searches and seizures to the states. *Wolf v. Colorado,* 338 U.S. 25, 69 S. Ct. 1359, 93 L. Ed. 1782 (1949), *overruled, Mapp v. Ohio,* 367 U.S. 643, 81 S. Ct. 1684, 6 L. Ed. (2d) 1081 (1961). The states were not, however, required to use the exclusionary rule as a means of enforcement. *Id.* This marked the first separation of the Fourth Amendment right from the remedy of exclusion. The dissent soundly criticized the decision: "[T]here is but one alternative to the rule of exclusion. That is no sanction at all." *Id.* at 41, 69 S. Ct. at 1369 (Murphy, J., dissenting).

[4] Although *Weeks* is generally regarded as the seminal case, the origins of the exclusionary rule can be traced to the much earlier case of *Boyd v. United States,* 116 U.S. 616, 6 S. Ct. 524, 29 L. Ed. 746 (1886). There, the Court relied on both the Fourth and Fifth Amendments to prohibit the introduction of certain papers into evidence.

Twelve years later, the Court overruled *Wolf,* holding that "all evidence obtained by searches and seizures in violation of the Constitution is, by that same authority, inadmissible in a state court." *Mapp v. Ohio,* 367 U.S. 643, 655, 81 S. Ct. 1684, 1691, 6 L. Ed. (2d) 1081 (1961). The Court reasoned that "[t]o hold otherwise is to grant the right but in reality to withhold its privilege and enjoyment." *Id.* at 656, 81 S. Ct. at 1692. Thus, the exclusionary rule again became an integral part of the Fourth Amendment.

Then came *United States v. Leon,* 468 U.S. 897, 104 S. Ct. 3405, 82 L. Ed. (2d) 677 (1984). There, the Court adopted the good faith exception, holding that the "exclusionary rule does not bar the admission of evidence obtained by officers acting in reasonable reliance on a search warrant which was issued by a detached neutral magistrate [even though the warrant was] ultimately found to be invalid." *State v. Johnson,* — S.C. —, —, 395 S.E. (2d) 167, 170 (1990) (stating the holding in *Leon*). The Court employed a cost/benefit analysis in reaching this result. In evaluating the costs, the Court considered the fact that the rule interfered with the truth-finding function of the criminal justice system and the further fact that "some guilty defendants may go free or receive reduced sentences as a result of favorable plea bargains." *Leon,* 468 U.S. at 907, 104 S. Ct. at 3412. In evaluating the benefits, the Court concluded that, in cases of good faith reliance on a defective search warrant, the deterrent effect on police officers is "marginal or nonexistent." *Id.* at 922, 104 S. Ct. at 3420. The dissent severely criticized the decision on numerous grounds, not the least of which was the accusation that the exception "put a premium on police ignorance of the law." *Id.* at 955, 104 S. Ct. at 3443 (Brennan, J., dissenting). Whether we agree with the decision is of no moment, at least not in this case. We are obligated to follow Supreme Court precedent when interpreting or applying cases under the Federal Constitution. *See Pennekamp v. Florida,* 328 U.S. 331, 66 S. Ct. 1029, 90 L. Ed. 1295

(1946) (the Supreme Court has the ultimate authority to determine the meaning and application of the Federal Constitution).[5]

## III.

### THE STATE CONSTITUTION

In words similar to those of the Fourth Amendment, Article I, § 10 of the South Carolina Constitution provides:

The right of the people to be secure in their persons,

---

[5] Some people might be so rude as to suggest that every time the United States Supreme Court revisits the Constitution its text becomes longer, while the list of civil liberties it provides becomes shorter. Some may say that when the Court adopted the good faith exception, it amended the Constitution without authority and ignored the original intent of the framers. (It is true that no such exception appears in the text of the Constitution, and it is difficult to believe that the Founding Fathers had no objection to warrantless searches so long as the agents of the King thought what they were doing was all right.) Invoking a dread pejorative, some might even say the Court is "liberal." In defense of the Court, it can be argued that the good faith exception is an exception, not to the Fourth Amendment, but to the exclusionary rule. *See United States v. Leon*, 468 U.S. 897, 104 S. Ct. 3405, 82 L. Ed. (2d) 677 (1984) (Justice White, writing for the majority, began by saying that the question of whether to apply the sanction is a question separate from the question of whether a violation has occurred.). On the other hand, the Court previously held that the exclusionary rule is "an essential part of both the Fourth and Fourteenth Amendments." *Mapp v. Ohio*, 367 U.S. 643, 657, 81 S. Ct. 1684, 1693, 6 L. Ed. (2d) 1081 (1961). Indeed, it can be argued that, had the exclusionary rule not been inherent in the Fourth Amendment, it could not have been applied to the states through the Fourteenth Amendment. Far be it from us to engage, gratuitously, in the debate, except to say that labels are particularly unhelpful. Popular imagination deems some judges liberal and others conservative. People say conservative judges obey the Constitution, while liberal judges try to reform it according to their personal convictions. Sorting out judges in this way ignores the interpretive nature of law. Judges who are called liberal and those who are called conservative agree about which words make up the Constitution. Their disagreement is about what standards the Constitution deploys for testing acts of the government. Both kinds of judges try to enforce the Constitution, and each kind thinks the other is subverting the Constitution. Thus, it is unfair to accuse either kind of judge of infidelity to the oath "to preserve, protect and defend the Constitution." R. Dworkin, *Law's Empire* (1986). It is also a colossal waste of time.

houses, papers, and effects against unreasonable searches and seizures and unreasonable invasions of privacy shall not be violated, and no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, the person or thing to be seized, and the information to be obtained.

S.C. Const. art. I, § 10.[6]

It is firmly established that state courts may interpret their own constitutions in such a way as to expand rights conferred by the Federal Constitution.[7] The principle of federalism envisions two separate and independent judicial systems: federal courts, which construe federal law, and state courts, which construe state law.[8] State courts may, therefore, develop state law to provide their citizens with a second layer of constitutional rights.[9] Thus, as a general proposition of law, we have the right to reject the rationale of *Leon* and determine that no good faith exception exists under our Constitution.[10] Whether we can do so in this case is another matter entirely.

---

[6] For at least two reasons, Article I, § 10 of the State Constitution is less difficult to interpret than the Fourth Amendment. In the first place, unlike the Fourth Amendment, the right of privacy is explicitly included in Article I, § 10. Secondly, because the present version of Article I, § 10 was not adopted until 1971, its framers are much easier to locate than the framers of the Fourth Amendment, and consequently, it is less difficult to determine their "original intent." The author of this opinion cannot resist pointing out that, in this regard, he is one of South Carolina's "Founding Fathers." *See Biographical Directory of the South Carolina House of Representatives*, vol. I, Session Lists 1692-1973 (1974) (listing Alex Sanders as a member of the Ninety-ninth General Assembly, First Session: January 12, 1971—July 2, 1971; September 14, 1971—November 9, 1971).

[7] *E.g., PruneYard Shopping Center v. Robins*, 447 U.S. 74, 100 S. Ct. 2035, 64 L. Ed. (2d) 741 (1980) (State courts may provide more expansive rights under their own constitutions than the rights which are conferred by the Federal Constitution.).

[8] *See Ableman v. Booth*, 62 U.S. (21 How.) 506, 516, 16 L. Ed. 169 (1858) ("[T]he powers of the General Government, and of the State, although both exist and are exercised within the same territorial limits, are yet separate and distinct sovereignties, acting separately and independently of each other, within their respective spheres.").

[9] Brennan, *State Constitutions and the Protection of Individaul Rights* 90 Harv. L. Rev. 489 (1977).

[10] Several states have, in fact, decided that no good faith exception exists under state law. *E.g., State v. Carter*, 322 N.C. 709, 370 S.E. (2d) 553 (1988); *State v. Novembrino*, 105 N.J. 95, 519 A. (2d) 820 (1987); *State v. Tanner*, 304 Or. 312, 745 P. (2d) 757 (1987); *Commonwealth v. Upton*, 394 Mass. 363, 476 N.E. (2d) 548 (1985); *People v. Bigelow*, 66 N.Y. (2d) 417, 488 N.E. (2d) 451,

For reasons unknown to us, Mr. Austin does not argue for reversal of his conviction based on the State Constitution. Although his exception asserts a violation of Article I, § 10, nowhere in his brief does he mention the State Constitution. An exception not argued in the brief is deemed abandoned on appeal. *State v. Stone*, 290 S.C. 380, 350 S.E. (2d) 517 (1986).

## IV.

## THE STATE'S ARGUMENT THAT MR. AUSTIN DID NOT HAVE A REASONABLE EXPECTATION OF PRIVACY

The State argues, in effect, that Mr. Austin lacks standing to challenge the search. It relies on the principle that a defendant who seeks to suppress evidence on Fourth Amendment grounds must demonstrate a legitimate expectation of privacy in connection with the searched premises. *See State v. McKnight*, 291 S.C. 110, 352 S.E. (2d) 471 (1987) citing *United States v. Salvucci*, 448 U.S. 83, 100 S. Ct. 2547, 65 L. Ed. (2d) 619 (1980), *Rawlings v. Kentucky*, 448 U.S. 98, 100 S. Ct. 2556, 65 L. Ed. (2d) 633 (1980), *Combs v. United States*, 408 U.S. 224, 92 S. Ct. 2284, 33 L. Ed. (2d) 308 (1972), *State v. Daniels*, 252 S.C. 591, 167 S. E. (2d) 621 (1969). Whether the State is entitled to prevail on this argument depends on a factual determination.[11]

---

497 N.Y.S. (2d) 630 (1985). *See generally* two excellent law review articles on which we have relied in writing this opinion: Comment, *The Good Faith Exception to the Exclusionary Rule: The Latest Example of "New Federalism" in the States*, 71 Marq. L. Rev. 166 (1987) (authored by Carolyn A. Yagla); Note, *United States v. Leon and Illinois v. Gates: A Call for State Courts to Develop State Constitutional Law*, [1987] 2 U.Ill. L. Rev. 311 (authored by Timothy R. Lohraff).

[11] *State v. McKnight* held that "the rights afforded by Section 17-13-140 are not dependent upon a showing of an expectation of privacy in the searched premises." 291 at 115, 352 S.E. (2d) at 474. But, as we have previously noted, Mr. Austin has not based his appeal on the statute governing search warrants. *Supra* note 1. Therefore, nothing about § 17-13-140 is before us. We are reminded of the story about the appellate judge and the man who wanted to cross the river. An appellate judge was sitting by a river when a man approached and said, "I want to cross the river. Will it be lawful for me to use this boat?" "It will be lawful," replied the judge, "it is my boat." The man thanked him and embarked, whereupon the boat sank and the man drowned. "Why," asked an indignant spectator, "did you not tell him that your boat had a hole in it?" "The matter of the boat's condition," said the judge, "was not brought before me." A. Bierce, *Fantastic Fables* (1899).

## V.

## OUR DECISION

### Issue 1

The good faith exception does not apply in this case.

■ The trial judge correctly ruled that the warrant was defective. The State does not challenge his ruling. The warrant was based on an affidavit reciting information supplied by an informant. The defect resulted from the fact that the affidavit did not contain information sufficient for the issuing magistrate to make a determination of probable cause. Specifically, the affidavit contained no information, circumstantial or otherwise, regarding the reliability of the informant. Nor did the affidavit say any of the information supplied by the informant had been corroborated.[12]

There is no objective basis for concluding that the officer acted in reasonable reliance on the warrant, believing it to be valid. He testified he knew the affidavit was supposed to contain information concerning the reliability of the informant, and he had no explanation for not having included the information. When asked whether he had told the judge anything about the reliability of the informant, he testified, "I don't remember." The State does not argue that he supplemented the affidavit by sworn oral testimony before the magistrate.

In *Leon,* the Court explicitly held that an officer does not "manifest objective good faith in relying on a warrant based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.' " 468 U.S. at 923, 104 S. Ct. at 3421. In the instant case, the officer testified to the effect that he actually knew the affidavit was insufficient. *Cf. State v. Johnson,* — S.C. —, 395 S.E. (2d) 167 (in which our Supreme Court refused to apply the good faith exception where the affidavit did not contain any information regarding the reliability of the informant and did not say the information supplied by the informant had been corroborated).

---

[12] *See Illinois v. Gates,* 462 U.S. 213, 238, 103 S. Ct. 2317, 2332, 76 L. Ed. (2d) 527 (1983) ("The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.").

For these reasons, we conclude that the trial judge erred in admitting the evidence under the good faith exception. Unless there is some other basis to affirm Mr. Austin's conviction, his conviction must be reversed.

## Issue 2

Because Mr. Austin has not argued for reversal based on Article I, § 10, we cannot answer the question of whether a good faith exception exists under the State Constitution. "[A]ppellate courts in this state, like well-behaved children, do not speak unless spoken to and do not answer questions they are not asked." *Langley v. Boyter*, 284 S.C. 162, 181, 325 S.E. (2d) 550, 561 (Ct. App. 1984), *rev'd*, 286 S.C. 85, 332 S.E. (2d) 100 (1985), but *cited with approval in Nelson v. Concrete Supply Co.*, — S.C. —, 399 S.E. (2d) 783 (1991). Undoubtedly, the question will be answered some day. Regrettably, today is not that day.

## Issue 3

As we have said, the question of whether Mr. Austin had a reasonable expectation of privacy in the searched premises is a question of fact. Mr. Austin testified that he did not live at the premises. To the contrary, he testified he lived at an entirely different place. He testified that his cousins lived at the premises. On the other hand, he testified that he regularly visits one of his cousins at the premises and that he had spent the night there, he estimated, every other weekend, for about a year. He was present at the premises when the search took place. "Maybe I was gone spend the night maybe that night," he said. He felt at home there, he said, "But I ain't got no room there. I didn't stay there. I didn't have any clothes there." The trial judge did not rule on the question of whether Mr. Austin had a reasonable expectation of privacy. Having ruled that the evidence was admissible under the good faith exception, there was no reason for him to have ruled on the standing issue. We do not normally rule on issues for the first time. Under the circumstances, we remand the case for a determination of the standing issue.

Remanded.

GARDNER and GOOLSBY, JJ., concur.