572 S.E.2d 467

**The STATE, Appellant,**

v.

**Victor Wyatt MISSOURI, Respondent.**

**No. 3563.**

Court of Appeals of South Carolina.

Heard Oct. 8, 2002.

Decided Nov. 12, 2002.

Rehearing Denied Jan. 24, 2003.

122

Attorney General Charles M. Condon, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Charles H. Richardson and Senior Assistant Attorney General Norman Mark Rapoport, all of Columbia; and Solicitor Robert M. Ariail, of Greenville, for Appellant.

Assistant Appellate Defender Tara S. Taggart, of Columbia, for Respondent.

ANDERSON, J.:

The Circuit Court found Victor Wyatt Missouri had "standing" to challenge the drug evidence introduced against him based on a violation of the Fourth Amendment. The State appeals, arguing Missouri did not have "standing" to challenge the drug evidence. We reverse.

### FACTS/PROCEDURAL BACKGROUND

In early 1995, Greenville detectives were investigating a crack cocaine ring. On February 3, 1995, the police obtained a warrant to search the apartment of Curtis Sibert for cocaine. When the police executed the search warrant, they found Missouri in the kitchen standing over a sink, facing a set of triple beam scales. The police discovered a quantity of cooked, crack cocaine inside the sink. Missouri was arrested and charged with trafficking in crack cocaine.

At trial, the lead detective admitted he lied in the affidavit issued in support of the search warrant. Further, according to Missouri, the affidavit omitted exculpatory information. The Circuit Court denied Missouri's motion to suppress the evidence obtained in the search. The Court of Appeals reversed the Circuit Court, ruling the omitted information was necessary for the magistrate's finding of probable cause. This Court remanded the matter for a hearing to determine whether Missouri had a reasonable expectation of privacy in the apartment. *State v. Missouri*, 97–UP–448 (S.C. Ct.App. filed September 15, 1997). The Supreme Court affirmed. *State v. Missouri*, 337 S.C. 548, 524 S.E.2d 394 (1999).

A hearing was held before the Circuit Court on remand to determine whether Missouri had a reasonable expectation of privacy in the apartment. Sibert, Missouri's best friend, testified that in 1994 and 1995, Missouri was an occasional overnight guest at Sibert's apartment "whenever [Missouri] got to arguing with his wife," whenever Sibert's wife would leave for the weekend, and whenever Missouri and Sibert would sneak away to "go partying." Sibert stated that Missouri kept a change of clothing at Sibert's apartment so Missouri could "go partying" with Sibert without Missouri's "wife" finding out. Missouri would stay in Sibert's son's room whenever he spent the night.

On certain occasions, Sibert would give Missouri a key to the apartment. Sibert declared that Missouri had a key to the apartment at the time of Missouri's arrest. According to Sibert, Missouri went to the apartment as a friend, not as a business associate, when Sibert was not there. Sibert left Missouri in control of the apartment when he was gone, with the ability to let people come and go as Missouri saw fit. Because Sibert's wife was trying to "kick" her drug addiction, Sibert testified that he would not have left Missouri in his apartment the day the search warrant was executed if he had known Missouri intended to mix the drugs there.

Sibert admitted on cross-examination that he returned to his apartment at 1:00 a.m. the night before the search warrant was executed and Missouri was not staying there. He did not recall the exact date when Missouri last spent the night at his apartment. Sibert professed he was not in the drug business and that he had no idea what Missouri was planning to do in his apartment when he left Missouri there the day the search warrant was executed.

Sibert's wife testified Missouri had a key to the apartment, he left a change of clothing there, and he had control of the apartment when she and Sibert were gone.

At the hearing, Missouri stated he was close friends with Sibert and had known him for many years. He occasionally spent the night at Sibert's apartment. Missouri declared that he was free to come and go from Sibert's apartment and would sometimes use the key Sibert had given him. Although Missouri had his own residence a few miles from Sibert's

apartment, Missouri would stay at the apartment whenever he was arguing with his fiancée or whenever he wanted to get out of the house. Missouri stayed in Sibert's son's room and he kept a change of clothes there. However, Missouri admitted that he did not spend the night at Sibert's apartment the night before the search warrant was executed. Missouri denied that he and Sibert had a business relationship regarding drug trafficking.

.The State presented the testimony of Detective Eric Cureton, the officer responsible for the false statements in the affidavit supporting the search warrant. Cureton was conducting surveillance on Sibert's apartment the day the warrant was executed. On that day, he observed Missouri enter the apartment between 2:30 and 3:00 p.m. and did not see any other person enter or exit the apartment. The search warrant was executed between 9:30 and 10:00 p.m., after Sibert called the confidential informant to inform him that it was time to "come and get it."

Cureton monitored Sibert and his wife purchasing baking soda at different locations around town earlier that day. Baking soda is used to aid in the cooking process, which turns cocaine into crack cocaine. Upon executing the warrant, Cureton discovered Missouri in the kitchen standing over several dishes of cooling crack cocaine. Sibert and his wife were sitting on the couch with the television on. The police examined Missouri's key chain. It held three keys: one to Missouri's residence, and two keys to two cars. The key chain did not contain a key to Sibert's apartment. In the kitchen, Cureton recovered a black bag belonging to Missouri and containing scales and packaging paper. No other items belonging to Missouri were found in the apartment.

On cross-examination, Cureton professed he was "confused" and an inexperienced police officer when he drafted the original affidavit in support of the search warrant. Cureton admitted he was not familiar with Missouri's clothes and did not know whether Missouri's clothes were in Sibert's apartment. Although Cureton checked the keys on Missouri's key ring, he returned the keys to Missouri after he was booked. Cureton was not aware of the friendship between Missouri and the Siberts.

Detective James Bradley testified that, upon executing the search warrant, he found Missouri in the kitchen with cooked crack cocaine. Bradley did not find any items in the apartment belonging to Missouri. When Missouri was searched, "some keys" were "taken off of him." The keys went to a van, another car, and Missouri's residence.

Missouri testified in reply regarding the keys. He stated he had more than three keys on his key chain.

The Circuit Court determined that Missouri and Sibert were close, long-time friends and Missouri visited Sibert frequently at Sibert's apartment. Missouri sometimes spent the night at Sibert's, but did not live with Sibert. The court found Missouri had access to the apartment, on some occasions had a key to the apartment, and was free to come and go as he pleased from the apartment. Further, the court noted the Siberts did not charge Missouri to stay at their apartment, he kept a change of clothes there, and Missouri used the apartment as a place to " 'get away.' " The court specifically found Missouri did not spend the night at the apartment the evening prior to the execution of the search warrant. Finally, the court concluded that, on the day the search warrant was issued, the police began surveillance of the Siberts' apartment at 7:00 a.m.; Missouri arrived between 2:30 and 3:00 p.m.; the Siberts left Missouri at their apartment while they went shopping; the search warrant was executed between 9:30 and 10:00 p.m.; and the officers discovered Missouri in the kitchen with crack cocaine and the Siberts in another room.

Based on the factual findings, the Circuit Court held that Missouri had a legitimate expectation of privacy in the Siberts' apartment and he would therefore be able to challenge the search under the Fourth Amendment.[1]

### STANDARD OF REVIEW

In criminal cases, the appellate court sits to review errors of law only. *State v. Wilson*, 345 S.C. 1, 545 S.E.2d 827 (2001); *State v. Cutter*, 261 S.C. 140, 199 S.E.2d 61 (1973). This Court

---

1. The court used the term "standing." The United States Supreme Court has indicated a preference for an evaluation of the substantive Fourth Amendment right. Accordingly, we will interchange this term for "standing" throughout this opinion.

is bound by the trial court's factual findings unless they are clearly erroneous. *State v. Quattlebaum*, 338 S.C. 441, 527 S.E.2d 105 (2000).

Our Supreme Court articulated the proper standard of review in regard to a Fourth Amendment issue relating to search and seizure:

> As a threshold matter, we must determine the appropriate standard of review to apply in considering the trial court's ruling below. . . . The test for making this determination entails an inquiry into the totality of the circumstances. . . . .
>
> . . . .
>
> Therefore, we will review the trial court's ruling like any other factual finding and reverse if there is clear error. We will affirm if there is any evidence to support the ruling.

*State v. Brockman*, 339 S.C. 57, 65–66, 528 S.E.2d 661, 665–66 (2000). We find the *Brockman* standard of review is controlling.

### *LAW/ANALYSIS*

■ The Fourth Amendment to the United States Constitution elucidates:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. The South Carolina Constitution provides similar protection against unlawful searches and seizures. *See* S.C. Const. art. I, § 10. Evidence obtained in violation of the Fourth Amendment is inadmissible in both state and federal court. *See Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914); *State v. Forrester*, 343 S.C. 637, 541 S.E.2d 837 (2001); *State v. Austin*, 306 S.C. 9, 409 S.E.2d 811 (Ct.App.1991).

■ Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously

128

asserted. *See Alderman v. United States,* 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969); *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). Thus, a person seeking to have evidence suppressed based upon a Fourth Amendment violation "must establish that his own Fourth Amendment rights were violated" by the search and seizure. *State v. McKnight,* 291 S.C. 110, 114–15, 352 S.E.2d 471, 473 (1987) (citing *United States v. Salvucci,* 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980)); *see also Rakas,* 439 U.S. at 138, 99 S.Ct. at 428, 58 L.Ed.2d at 398 (" 'rights assured by the Fourth Amendment are personal rights, [which] . . . may be enforced by exclusion of evidence only at the instance of one whose own protection was infringed by the search and seizure' ").

 It is not necessary for a defendant to be an owner of a property in order to claim Fourth Amendment rights. *State v. Daniels,* 252 S.C. 591, 167 S.E.2d 621 (1969). However, a defendant seeking to suppress evidence on Fourth Amendment grounds bears the burden of proving he had a reasonable expectation of privacy in the area searched or the item seized. *United States v. Rusher,* 966 F.2d 868 (4th Cir.1992) (citing *Rawlings v. Kentucky,* 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980)); *McKnight,* 291 S.C. at 115, 352 S.E.2d at 473. "A subjective expectation of privacy is legitimate if it is one that society is prepared to recognize as reasonable." *Minnesota v. Olson,* 495 U.S. 91, 95–96, 110 S.Ct. 1684, 1687, 109 L.Ed.2d 85, 92 (1990) (internal quotations omitted).

In determining whether a particular defendant may challenge a search and seizure, the United States Supreme Court has indicated a preference for an analysis focusing on "the extent of a particular defendant's rights under the Fourth Amendment, rather than on any theoretically separate, but invariably intertwined concept of standing." *Rakas,* 439 U.S. at 139, 99 S.Ct. at 428, 58 L.Ed.2d at 398; *see also State v. Hiott,* 276 S.C. 72, 76–77, 276 S.E.2d 163, 165 (1981) ("the United States Supreme Court has recently shifted away from a 'standing' approach to an inquiry focusing directly on the substantive issue of whether the claimant possessed a 'legitimate expectation of privacy' in the area searched.").

Whether a defendant has a reasonable expectation of privacy in a particular premises depends on the status of the defendant. The Fourth Amendment offers more protection to an overnight guest than to one who is merely a casual guest or conducting a business transaction. In *Minnesota v. Olson,* 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990), police entered a residence, without a warrant, to apprehend an overnight guest who was a suspect in a murder and robbery. The Supreme Court found the defendant's status as an overnight guest alone was "enough to show that he had an expectation of privacy in the home that society is prepared to recognize as reasonable." *Olson,* 495 U.S. at 96–97, 110 S.Ct. at 1688, 109 L.Ed.2d at 93.

By contrast, in *Minnesota v. Carter,* 525 U.S. 83, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998), two defendants were in the apartment of the lessee for the sole purpose of packaging cocaine. The two defendants paid the lessee of the apartment one-eighth of an ounce of cocaine for the two and one-half hours they used the apartment. There was no indication that the two defendants had a prior relationship with the lessee of the apartment. The Supreme Court held that, unlike the overnight guest in *Olson,* the two defendants in *Carter* had no reasonable expectation of privacy in the apartment because they were guests "simply permitted on the premises" and were present solely for a business transaction. *Carter,* 525 U.S. at 91, 119 S.Ct. at 474, 142 L.Ed.2d at 381.

The facts in the present case are more akin to those found in *Carter.* Missouri clearly had a long relationship with Sibert and had periodically been an overnight guest in Sibert's apartment with the occasional use of a key to the apartment. When Missouri spent the night with Sibert, he was free to come and go as he pleased. However, Missouri was not an overnight guest the evening before the search warrant was executed. Moreover, he had only been present at Sibert's apartment for a few hours. Despite Missouri's testimony that he kept clothes in the apartment and that he had a key, neither his clothes nor a key was found. The major purpose of Missouri's presence was to cook cocaine into crack cocaine.

We find Missouri's occasional status as an overnight guest did not extend to this instance where he was merely a

permittee on the premises. Further, as he was assisting Sibert with the manufacture of crack cocaine, Missouri's main purpose for being on the premises was for "business" reasons.

## CONCLUSION

We hold Missouri had no reasonable expectation of privacy. Concomitantly, he did *not* have "standing" to assert a violation of the Fourth Amendment. We rule that, at the time the search warrant was executed, Missouri was merely a permitted guest conducting business, not an overnight guest entitled to Fourth Amendment protection. We **REVERSE** the Circuit Court's finding that Missouri had "standing" to assert a violation of the Fourth Amendment.

**REVERSED.**

STILWELL, J., concurs.

CONNOR, J., dissents in a separate opinion.

CONNOR, J. (dissenting):

I respectfully dissent and would affirm the trial judge's ruling. I believe Missouri had a legitimate expectation of privacy in the Siberts' apartment.

As noted by the majority, the trial judge's ruling on this issue can only be reversed if there is clear error. If any evidence supports the ruling, it will be affirmed. *State v. Brockman,* 339 S.C. 57, 65–66, 528 S.E.2d 661, 665–66 (2000); *State v. Williams,* 351 S.C.App, 591, 571 S.E.2d 703 (2002) (Shearouse Adv. Sh. No. 32 at 66).

The majority opinion outlines the numerous findings of fact made by the trial judge. After observing all of the witnesses, the trial judge found Missouri had a legitimate expectation of privacy in the premises searched.

The trial judge specifically found that Missouri and Curtis Sibert were "good friends" and had grown up together, and that Missouri frequently visited the Siberts' apartment, sometimes spending the night. Moreover, he found that Missouri on "some occasions" had a key to the apartment and kept a change of clothes there. He also found the Siberts did not charge Missouri to use the apartment.

However, the majority makes its own findings of fact, some contrary to those made by the trial judge. The majority characterizes Missouri's relationship with the Siberts as that of an "occasional" or "periodical" overnight guest. Furthermore, the majority finds "neither [Missouri's] clothes nor a key was found" in the apartment. It also states the main purpose of Missouri's presence at the apartment was for "business" reasons.

The United States Supreme Court, in *Minnesota v. Olson,* 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990), held an overnight guest had a reasonable expectation of privacy.[2]

On the other hand, in *Minnesota v. Carter,* 525 U.S. 83, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998), the Court addressed "the issue of whether a person present in another's home for a 'purely commercial . . . transaction,' for only a 'relatively short period of time,' and having no 'previous relationship with' the householder, could claim the Fourth Amendment's protections." *Morton v. United States,* 734 A.2d 178, 180 (D.C.1999) (quoting *Carter,* 525 U.S. at 91, 119 S.Ct. 469). The Court

---

**2.** In reaching this conclusion, the Court recognized the facts of *Olson* were similar to those in *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). *Olson,* 495 U.S. at 97, 110 S.Ct. 1684. *Jones* is likewise instructive in the present case. The defendant in *Jones* sought to challenge a search warrant after being arrested in a friend's apartment. Jones testified that "the apartment belonged to a friend . . . who had given him the use of it, and a key, with which [Jones] had admitted himself on the day of the arrest." *Jones v. United States,* 362 U.S. 257, 259, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), *overruled in part by United States v. Salvucci,* 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980) (rejecting the "automatic standing" rule based on possession of seized goods established in *Jones* ). Jones also testified he had clothing in the apartment, "that his home was elsewhere, that he paid nothing for the use of the apartment, that [his friend] had let him use it 'as a friend,' [and] that he had slept there 'maybe a night[.]' " *Id.* The Court ruled Jones could challenge the search because he was "legitimately on [the] premises." Although this particular standard has been repudiated, the Court stated it did "not question the conclusion in *Jones* that the defendant in that case suffered a violation of his personal Fourth Amendment rights if the search in question was unlawful." *Rakas v. Illinois,* 439 U.S. 128, 141, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). "*Rakas* thus recognized that, as an overnight guest, Jones was much more than just legitimately on the premises." *Olson,* 495 U.S. at 98, 110 S.Ct. 1684. There is nothing in *Jones* to indicate the defendant was an overnight guest the evening before the search warrant was executed.

said such person did not have a reasonable expectation of privacy.

In *Carter*, the Court held there was nothing "similar to the overnight guest relationship in *Olson* to suggest a degree of acceptance into the household." *Carter*, 525 U.S. at 90, 119 S.Ct. 469. The Court further stated: "If we regard the overnight guest in *Minnesota v. Olson* as typifying those who may claim the protection of the Fourth Amendment in the home of another, and one merely 'legitimately on the premises' as typifying those who may not do so, the present case is obviously somewhere in between." *Carter*, 525 U.S. at 91, 119 S.Ct. 469.[3]

I believe this case is more like *Olson* than *Carter*. In *Carter* there was "no suggestion that [the defendants] had a previous relationship with [the householder], or that there was any other purpose to their visit." *Carter*, 525 U.S. at 90, 119 S.Ct. 469. In this case Missouri and Sibert were good friends, and Missouri had visited the apartment on a frequent basis, sometimes spending the night. Missouri was free to come and go as he pleased and paid nothing to use the apartment. Missouri had a change of clothes at the apartment and on some occasions had a key. He used the apartment as a place to "get away" and as a place to "find comfort." On the day the warrant was executed, Missouri had been at the apartment for approximately seven hours. Additionally, when left alone at the apartment, Missouri could control who came and entered the apartment.

The trial judge's findings of fact support his ruling that Missouri had a legitimate expectation of privacy in the apartment. This ruling is clearly supported by the evidence. Therefore the trial judge should be affirmed.

---

**3.** The Court in *Carter* also recognized the continuing validity of the factual "holding of *Jones* that a search of the apartment violated the defendant's Fourth Amendment rights." *Carter*, 525 U.S. at 89–90, 119 S.Ct. 469.